Christian, J.
These three cases were heard together at the late session of this court at Richmond. The arguments of counsel were submitted just before the adjournment of that session, which left us no time for their consideration. They involve the question [so full of interest and importance to the whole people of this Commonwealth,] as to the validity of that provision of the State constitution and the act of the General Assembly, passed in pursuance thereof, which exempts from execution, or other legal process, a homestead to each householder or head of a family to the value of two thousand dollars.
This court, deeply impressed with the magnitude of the subject, and the high responsibility imposed upon it in the final adjudication of the question, has had the subject, since its adjournment at Richmond, under careful and anxious consideration.
It is much to be regretted that a subject of such general interest and importance should not, at an earlier day, have received the final adjudication of the supreme tribunal constituted by law, to pronounce the supreme law of the State, instead of being left to the decision of inferior courts, some of which have sustained the validity of the “homestead exemption,” while others have pronounced against it, thus leaving the law unsettled, and the people, both debtor and creditor, in doubts as to their rights and liabilities.
Rot long after the constitution of the present court, *280 the announcement was made from the bench, by the president, that the court would take up out of its turn for hearing any case involving this question. No such case, however, was ready to be heard [until near the close of the last session at Richmond,] and we now proceed, at the earliest moment consistent with a due consideration of the important questions involved, to pronounce our unanimous judgment upon the cases submitted to us.
No question of greater delicacy can ever be presented to a judicial tribunal, and especially to one of the last resort, and from which there is no appeal, than a question involving the validity of an act of the legislature, particularly where the act is in furtherance of a provision of the organic law of the State, incorporated in the solemn form of a constitution. Such a law, in pursuance of such a provision, organic in terms, and purporting to speak in solemn form, the sovereign will of the people, must be always sustained and upheld, unless it is plain that it abrogates and annuls that “supreme law of the ■land,” the constitution of the United States.
And while it is the duty of the judical department generally to give effect to the acts of its co-equal and co-ordinate department, the legislative, and always in a doubtful case to solve the doubt in favor of the validity of the law; on the other hand, it is one of its highest duties and most solemn prerogatives to declare what the law is. And where the legislative will, or the popular will declared in the solemn form of a constitution, is in contraveution of the supreme law of the land, the judicial department must uphold that 'lato, and unflinchingly guard it as inviolable. This principle and this duty grow out of no superiority, which the judical department of the government claims over the legislative, but is inherent in the vei’y nature and form of our system of government. In exercising this high authority, the courts claim no supremacy over the legislature. They *281 are only the administrators of the paramount law expressing the public will. If an act of the legislature is held void, it is not because the courts have any control over legislative power, but because the act is forbidden by the constitution, and because the will of the people therein declared is paramount to that of their representatives expressed in any law. The power, however, is a delicate one, and is always exercised with reluctance and hesitation. But it is a duty which the courts in a proper case are not at liberty to decline, but must firmly and conscientiously perform.
The provisions of the constitution, and the act of the legislature made in pursuance thereof, the validity of which is called in question in the cases before us, is in these words:
Article XI, section 1. “Every householder or head of a family shall be entitled, in addition to the articles now exempt from levy or distress for rent, to hold exempt from levy, seizure, garnisheeing, or sale under any execution, order or other process issuing on any demand for any debt heretofore or hereafter contracted, his real or personal property, or either, including money or debts due him, whether heretofore or hereafter acquired or contracted, to the value of not exceeding two thousand dollars, to be selected by him,” &c.
The single question which we have to determine is whether this provision of the State constitution, and of the act of 1870, which is but a copy of this article, is in violation of the provision of the constitution of the United States, which declares that “no State shall pass any law impairing the obligation of a contract.”
We may observe, before proceeding to discuss the main question, that this prohibition of the Federal constitution is upon the State, without regard to the form its laws may take, or the agencies which enact them. It is certain that the obligation of a contract can no more be impaired by the constitution of a State than by an act *282 of its legislature. It has been well settled by the adjudications of the Supreme court of the United States? that a State can no more impair the obligation of a contract by adopting a constitution than by passing a law. In the eye of the constitutional inhibitions they are substantially the same thing. Dodge v. Woolsey, 18 How. U. S. R. 334; White v. Hart et al., (not yet reported). December term, 1870.
The validity of the law in question is attempted to be maintained upon three grounds:
1st. That when the constitution containing the homestead provision was adopted, Yirginia was not a State of the Union ; that she had sundered her connection aa such, and was a conquered territory wholly at the mercy of the conqueror ; and that hence the inhibition of the States, by the constitution of the United States, to pass any law impairing the obligation of contracts, had no application to Yirginia; that the constitution, having ne validity until approved by Congress, was the act of Congress, and not of the State ; and though a State cannot pass any law impairing the obligation of contracts, Congress may; and that for this reason also the inhibition in the constitution of the United States has no operation.
2d. That the law in question affects only the remedy, and does not impair the obligation of contracts ; that all exemption laws must be considered as affecting the remedy only, and that the legislature has the right to modify the remedy as it may deem proper.
3d. That the power of the legislature to exempt certain articles of necessity has never been questioned, and that the amount of exemption is a matter of discretion with the legislative department of the government, with which the judicial department cannot interfere.
It is upon these three propositions that the argument in favor of the validity of the “homestead exemption,5, is based ; and, if either one is sound, the law must be sustained as valid and constitutional.
*283 As to the first proposition, to wit, that the inhibition of the constitution of the United States applies to States in the Union, and that Yirginia was not at the time of the adoption of her present constitution a State in the Union, it is sufficient of remark that very recently that question has been definitely adjusted by the Supreme court of the United States, and the status of the seceding States with reference to the Federal Union is no longer an open question.
The case of White v. Hart, decided at the last term of that court, was a writ of error to the Supreme court of the State of Georgia. The constitution of that State contained a provision “that no court or officer shall have, nor shall the General Assembly give, jurisdiction, to try or give judgment on, or enforce any debt, the consideration of which was a slave, or the hire thereof; ” and the question was, whether this provision of the constitution of Georgia was in conflict with that of the constitution of the United States, which declares that no State shall pass any law impairing the obligation of a contract. The Supreme court of Georgia decided in favor of the validity of the constitutional provision of that State. That judgment was reversed by the Supreme court of the United States. It was sought to be maintained mainly upon the ground that when the constitution of 1868 was adopted Georgia was not a State in the Union,, and that the inhibition of the constitution of the United States had no application to her.
This question, which had been incidentally discussed in other cases before that court, was thus directly brought up and pronounced upon by that tribunal. Mr. Justice Swayne, delivering the opinion of the court, says : “At no time were the rebellious States out of the pale of the-Union. Their rights under the constitution were suspended, but not destroyed. Their constitutional duties- and obligations were unaffected and remain the same.”
* * “Georgia, after her rebellion, and before her- *284 representation was restored, had no more power to grant a title of nobility, to pass a bill of attainder, an ex post facto law, or law impairing the obligation of contracts, or to do anything else prohibited to her by the constitution of the United States, than she had before her rebellion began, or after her restoration to her normal position in the Union.”
This decision upon a constitutional question, made by the highest tribunal in the land, specially constituted and clothed with the authority to adjudicate questions of this character, is binding upon this court; and while we do not adopt its language or its reasoning in all respects, its conclusions must be adopted as settling the status of the seceding States. But if the question was not res adjudícala—if it were still an open question whether tbe seceding States by the act of secession actually sundered their connection with the Federal Union—the result, in my view, would be precisely the same. If they are to be regarded as “out of the Union” from the date of the adoption of their respective ordinances of secession until their representation in Congress was restored, yet the moment they were readmitted and restored to their normal position in the Union, the constitution of the United States at once operated upon them as the “ supreme law of the land,” and they became at once bound by the force of its prohibitions, as well as entitled to the benefits of its protection. And if there was anything in their constitution and laws in conflict with the constitution of the United States, thenceforward the latter would prevail as controlling and supreme.
But it is further insisted by the counsel for the appellants, that the present constitution of Virginia, having no validity under the reconstruction laws, until approved by Congress, must be regarded as a law of Congress; and that therefore the inhibition of the constitution of the United States which is upon the States, and not upon Congress, has no application.
*285 Iii answer to this view (which I would not deem it necessary to notice, except out of respect to the counsel who so earnestly pressed it in argument), it is sufficient to remark, first, that in no sense can the constitution of this State be regarded as a law of Congress. It is true that, under the act of March 1867, the approval of the constitution by Congress was required before the State should be entitled to representation. The effect of withholding its approval would have been to continue the military government to which the State was then subjected. But when the constitution was approved, and senators and representatives elected under it admitted, it then became the organic law of this State, binding upon all the citizens of the State and all departments of the State government organized under it, except so far as any of its provisions may be in conflict with the constitution of the United States. If it is to be considered a mere creature and law of Congress, then Congress may repeal it and declare it void. It can no more do this than it can declare the constitution of New York a nullity. It is as much the constitution of Virginia, and beyond the power or control of Congress, as theaconstitution of any of the northern States of the Union. The approval of the constitution by Congress was a condition precedent to the withdrawal of the military authority of the United States, and re-establishment of the civil authority of the State. That having been accomplished, the power and authority of Congress (if it ever legitimately had any) is at an end.
But suppose the constitution of Virginia could, in any view, be considered an act of Congress, then I deny that Congress can violate the constitution of the United States any more than a State. That constitution is the “ supreme law of the land,” paramount in its obligation and binding force upon all departments of government, State and Federal; upon the Hational legislature as well as the State legislatures; upon the judicial and executive, *286 as well.as upon the legislative departments of both Federal and State governments; upon the whole people, governing and restraining their acts and conduct, whether exercised by their representatives in the National Congress, or by their representatives in State conventions and State legislatures. It is to each and all the supreme law of the land.
It would be a monstrous fallacy to hold, either that Congress can authorize a State to do that which the constitution of the United States prohibits a State from doing, or that Congress may itself supersede the National constitution.
The prohibition of the constitution upon the States was necessary because the States could do anything not prohibited by the constitution. The prohibition upon Congress was not necessary, because Congress could do nothing except under powers granted by the constitution. But I will not pursue the discussion further, because the point that Congress no more than a State can supersede the National constitution has been very recently expressly decided by the Supreme court of the United States. See White v. Hart, to be reported in 13 Wallace, decided at the last term.
I am therefore of the opinion that the validity of the “homestead exemption” cannot be maintained upon the first ground insisted upon by the appellant’s counsel.
I am now to consider the second proposition upon which it is sought to be maintained, to wit, that “ the law in question affects the remedy only, and does not therefore impair the obligation of contracts,” and consequently is not within the inhibition of the constitution of the United States. It here becomes necessary to ascertain with precision the meaning of the constitutional prohibition and the object of its insertion. Its object plainly was to secure against legislative invasion the sanctity of contracts, and to preserve their uniform inviolability in all the States. Of such importance is this *287 principle regarded, that the large majority of the States have incorpoi’ated it either in their bill of rights or constitution in the same language used in the constitution of the United States.
It was said by this court in Taylor v. Stearns, 18 Gratt. 244, after an instructive review of the circumstances under which this restriction was adopted, “ the contemporaneous histoiy of the legislation out of which this restriction grew, and the declarations of the framers of the constitution, conclusively prove that this clause was designed to interdict to the States all legislative interference with contracts, such as had so disastrously relaxed the moi’als, intei’rupted the commerce, and disturbed the harmony of the States. For obvious reasons, no attempt was made to enumerate cases within this prohibition ; but its terms were so comprehensive as clearly to embrace the antecedent mischiefs to which it was directed, as well as to provide against future evils of the same kind.” The terms used in the constitution, “no State shall pass any law impairing the obligation of a contract,” are terms, in the language of Chief Justice Marshall, for which “it would seem difficult to substitute words which are more intelligible or less liable to misconstruction.” Sturges v. Crowningshield, 4 Wheat. R. 122.
But plain and comprehensive as are the terms used in the constitution, they have been the subject of settled judicial intei’pretation by the Supreme court of the United States, as well as the Supi’eme courts of many of the States of the Union, and we are not left to etymological discussion to arrive at their true meaning and legal import. These are indubitably and irreversibly fixed by a weight of authority which cannot now be shaken.
The decisions of the Supreme court of the United States in a long series of years, from Fletcher v. Peck, 6 Cranch, decided in 1810, down to White v. Hart, to be reported in 13 Wallace, decided in December 1871, *288 have given a uniform and unvarying construction to this clause of the Federal constitution.
From these decisions may be extracted the following propositions as to the true interpretation and legal import of the constitutional provision referred to:
(1.) The obligation of a contract is the law which binds the parties to perform their agreement.
(2.) Rothing can be more material to the obligation than the means of its enforcement. The ideas of validity and remedy are inseparable, and both are parts of the obligation, which are guaranteed by the constitution against invasion.
(3.) The laws which subsist at the time and place of making a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated into its terms.
(4.) It is competent for the States to change the form of the remedy, or to modify it otherwise as they may see fit, provided that no substantial right secured by the contract is thereby impaired. But any law, which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the constitution.
Fletcher v. Peck, 6 Cranch R. 87; Green v. Biddle, 8 Wheat. R. 1; McCracken v. Haywood, 2 How. U. S. R. 608; Sturges v. Crowningshield, 4 Wheat. R. 122; Ogden v. Saunders, 12 Wheat. R. 213; Von Hoffman v. City of Quincy, 4 Wall. U. S. R. 553; Hawthorne v. Calef, 2 Id. 10; White v. Hart, to be reported in 13 Wallace.
These decisions have been uniformly followed by this-court, and recently re-affirmed in the cases of Taylor v. Stearns, 18 Gratt. 244, and the Bank of the Old Dominion v. McVeigh, 20 Gratt. 457.
Applying these principles which must be regarded as now well settled (notwithstanding some contrary decisions of State courts, which I shall notice presently), let. *289 us enquire what were the mutual rights and obligations of debtor and creditor as to contracts made before the “homestead law.55
The obligation of the debtor was to pay his debt. The right of the creditor was to enforce its payment. Under the laws existing at the time, which entered into and were a part of the contract, the creditor bad a right to subject, by execution or other legal process, the whole property of the debtor, (except certain articles of personal property already exempted by existing laws). Hay more; the debtor was prohibited from withdrawing his property from that liability, and appropriating it, either openly or upon secret trust, to his own use, or the use of his family. Every attempt to do that was, by law, declared fraudulent and void. But this “homestead law,55 to the extent of two thousand dollars, takes away the right which the creditor had- at the time that the contract was entered into to enforce the payment of his debt, and allows the debtor to make a conveyance of the property, to that extent, for the use of himself and family, which, before the law was passed, would have been pronounced by the courts fraudulent and void. How can it be said that such a law does not impair the obligation of the contract? “One of the tests that the contract has been impaired (says Mr. Justice "Woodbury, in Planters' Bank v. Sharp, 6 How. U. S. R. 327), is that its value has, by legislation, been diminished. It is not by the constitution to be impaired at all.55 In nine cases out of ten, under this law, the obligation of the contract has not only been impaired, but utterly destroyed ; its value has not only been diminished, but its enforcement is made impossible. In the large majority of cases the remedy is not only obstructed, but wholly denied. I am aware that some of the decisions of the State courts have gone to the extent of maintaining the validity of exemption laws even as to antecedent debts, but I have seen no opinion which can be regarded as *290 Prevading authority against the unbroken current of decisions of the Supreme court of the United States, from 1810 down to 1871, and which have been uniformly actec^ uPon aQd followed in this country.
The difference of judicial opinion and interpretation (if there can be said to be any difference worthy of an attempt to reconcile, the great weight of authority, even in the State courts, being one way), grows out of a confused and untenable distinction between laws which operate on the rights, under a contract, and those which operate on the remedies by which they are to be enforced. Those distinctions have grown up from the dicta of judges wrested from the connection in which they were used, and upon which ingenious theories have been built up, to sustain popular legislation.
Every opinion which I have seen sustaining the validity of the “homestead exemption,” as applicable to antecedent contracts (except those cases like the Georgia case, lately overruled by the Supreme Court of the United States, which puts the decision upon the ground that Georgia was not a State in the Union, and therefore not governed by the constitutional prohibition), is based upon a dictum of Chief Justice Taney, in Bronson v. Kinzie. And yet Bronson v. Kinzie is one of the very strongest cases in favor of the now acknowledged doctrine of the Supreme court, that the laws in force at the time of the contract, and the .place of its performance, enter into and form a part of it, as if they were expressly referred to and incorporated into its very terms; and that any subsequent law which in its operation amounts to an obstruction or denial of the rights accruing by a contract, though professing to act only on the remedy, is clearly obnoxious to the prohibition of the constitution.
I say, most if not all the cases which attempt to sustain these homestead laws in other States, are based upon an obiter dictum of Chief Justice Taney, in Bronson v. Kinzie, (for the question of the absolute exemption of *291 property did not arise in the case,) and that dictum even does not justify the decisions, for it is wrested from its connection, and the sense is obscured by giving only a garbled extract from his opinion.
The chief justice is speaking of the right of a State to modify remedies and regulate modes of proceedings in its courts. He uses the following language :
“ For, undoubtedly, a State may regulate at pleasure, modes of proceedings in its courts, in relation to past contracts as well as future. It may, for example, shorten the period of time within which claims should be barred by the statute of limitations. It may, if it think proper, direct that necessary implements of agriculture, or the tools of a mechanic, or articles of necessity in household furniture, like wearing apparel, shall not be liable to execution on judgments. Regulations of this description have always been considered in every civilized community as properly belonging to the remedy to be exercised or not by every sovereignty according to its own rules of policy and humanity. It must reside in every State to enable it to secure its citizens from unjust and harrassing litigation, and to protect them in those pursuits which are necessary to the existence and well being of every community. And although a new remedy may be devised, less convenient than the old one, and may in some degree render the recovery of debts more tardy and difficult, yet it will not follow that the law is unconstitutional.”
Those who ground themselves upon this language of the chief justice stop here; and if he had stopped here, without qualification of these remarks, there might have been some foundation for the position taken in the cases referred to. But the chief justice adds this significant language: te Whatever belongs merely to the remedy, may be altered according to the wdll of the State, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it 'is immaterial *292 ichether it is done by acting on Ike remedy or directly on the contract itself. In either case it is prohibited by the constitution.
After quoting and approving the decision of the Supreme court in Green v. Biddle, a strong case in support of the doctrine, that the impairment of a contract, whether the law operates on the remedy or directly on the contract, is forbidden by the constitution, he proceeds to say, “Ho one, we presume, would say that there is any substantial difference between a retrospective law declaring a particular contract or class of contracts to be abrogated and void, and one which took away all remedy to enforce them, or encumbered it with conditions that rendered it useless or impracticable to pursue it. ”
' After quoting a paragraph from Mr. Blackstone’s Commentaries on the laws of England, he proceeds : “We have quoted the entire paragraph because it shows and illustrates by a familiar example the connection of the remedy with' the right. It is the part of the municipal law which protects the right and the obligation by which it enforces and.maintains it. It is this protection which the clause in the constitution now in question is mainly intended to secure. And it would be unjust to the memory of the distinguished men who framed it, to suppose it was designed to protect a mere barren and abstract right without any practical operation upon the business of life. It was, undoubtedly, adopted as a part of the constitution for a great and useful purpose. It was to maintain, the integrity of contracts and to secure their faithful execution throughout this Union, by placing them under the protection of the constitution of the United States. And it would ill become this court, under any circumstances, to depart from the plain meaning of the words used, and to sanction a distinction between the right and the remedy which would render this provision illusive and nugatory ; mere words of form affording no protection and producing no practical results.”
*293 Such is the language of Chief Justice Taney, in Bronson v. Kinzie, the case mainly relied on by those who maintain the position that the legislature may, in its discreti'on, exempt property of the debtor to the amount of thousands, and that such exemption is lawful and valid even against antecedent debts. It seems to me to be a strange misconception of the meaning, and a perversion, of the sound doctrines of this opinion, to rely upon it as authority to sustain homestead exemptions to the value of thousands of dollars.
But even this dictum of Chief Justice Taney has been virtually overturned by the decision in McCracken v. Hayward, 2 How. U. S. R. 608, and Planters’ Bank v. Sharp, 6 Id. 827. The first named was a case where the law -was applicable to the remedy only. The case arose upon a statute touching sales upon executions. The law provided that where executions should be levied upon any property, real or personal, it should be the duty of the officer to summon three householders, who, after being sworn, should fairly and impartially value the property ; and when offered for sale it should not be sold unless two-thirds of the amount of such valuation should be bid therefor. This law was held by the Supreme court of the United States to be unconstitutional and void. If a law7 which only prohibits a creditor from taking the property at less than two-thirds of its sworn value, cannot be supported, it needs no argument to prove that a law cannot be upheld which toholly withdraios the property from the reach of the creditor.
. This dictum has also been overruled by the last named case, in which Mr. Justice Woodbury says: “One of the true tests that a contract has been impaired is, that its value has been diminished. It is not by the constitution to be impaired at all.”
And yet this mere dictum (already overruled) of the Chief Justice, which favors the opinion that “necessary implements, or the tools of a mechanic, or articles of *294 necessity in household furniture, like wearing apparel, may be exempted from sale on execution,” is seized upon as the foundation of a false judicial interpretation, which, in some of the southern States, has upheld as valid, exemption laws, which, in the great majority of cases, exempts the whole property of the debtor.
They rest upon the fallacy of assuming that the legislature has the power to make exemptions of what is “necessary” to the debtor or his family. The implements of agriculture are no more a necessity to the farmer than a farm upon which to use them; and “household furniture” is no more essential to the head of a family than a house to live in. The mechanic must have a workshop as well as the tools of his trade, and to all classes money or property with which to purchase food and raiment is as needful as anything else. It Í3 upon reasoning like this, based upon a false premise and a solitary dictum, which has been wrested from its connection with language which qualifies its meaning, that some of the courts referred to, in their efforts to uphold a popular law, have held to be valid and constitutional, laws which exempt and withdraw from the reach of the creditor property to the value of thousands of dollars, and hundreds of acres of land, whether worth one dollar or one thousand dollars per acre; indeed, exempting the whole property which the debtor had in his possession at the time the contract was made, and upon the faith of which the debt was contracted. Such is the absurd result to which this doctrine has been carried.
And indeed this is the logical result of conceding the power of the legislature to exempt from execution, by a subsequent law, property which was liable to execution at the time the debt was contracted. There is, I conceive, no well defined middle ground between holding that none of the debtor’s property can, by a subsequent law, be withdrawn from the reach of the creditor, or *295 else admitting that the whole of his estate may he ex•empted from sale or execution. In my view, the true doctrine, sustained by the great weight of authority, is that such property as was subject to execution at the time the debt was contracted must continue subject to execution until the debt is paid, so long as it remains in the hands of the debtor. The legislature of this State, up to the adoption of the present constitution, have always recognized this as the correct principle; and whenever, in the interest of humanity or sound policy, they have added to the list of exemptions other property of the debtor not exempted before, they have been careful to make such laws prospective—never retrospective—in their operation; applying the additional exemptions to future—never to past—obligations. As to future obligations, the legislature may make the exemption as broad as it pleases. It may abolish credit altogether. But it cannot, by retrospective legislation, annul the force of prior obligations. If it could do this, then the integrity of contracts, and the security for their faithful execution, in every State in the Union, would no longer be placed under the protection of the constitution of the United States, but would rest entirely upon the discretion of the legislatures or conventions of the several States. And where would be found the limit upon that discretion ? The power to exempt two thousand dollars carries with it the power to exempt f10,000 or $20,000, or the whole property of the debtor.
One of the counsel who argued in favor of sustaining the homestead exemption, insisted that the amount of ■exemption was wholly a matter of legislative discretion, and that the judicial department of the government ■could not interfere with this legislative discretion. This is a concession that it is without limit or control, and that it is in the power of the legislature virtually to wipe out every debt and destroy every contract of the citizens •of this common-wealth, by withdrawing property of the *296 debtor from tbe reach of the creditor; and that this may be done in the teeth of that provision of the Federal constitution, which declares that “no State shall pass any law impairing the obligation of a contract.” Was it to protect a mere barren and abstract right that this pro-, .vision was adopted? Was it a declaration of a moral principle, without any binding force upon the States, or without any practical operation upon the business of life? Or was it adopted as a part of the constitution for the great and useful purpose of maintaining the integrity of contracts, and securing their faithful execution,, throughout the Union, by placing them under the protection of the constitution of the United States, and by pledging the public faith in the most solemn form, that the obligation of contracts, public and private, should remain forever inviolable? There can be but one answer to these questions, and it would not only be “unjust to-the memory of the great men who framed the constitution,” but in violation of the judicial opinions of the, great men who have expounded the constitution, to-sanction a doctrine which would render one of its plain provisions illusive and nugatory—mere words of form, affording no protection, and producing no practical results.
The exemption law under consideration' withdraws-from the reach of his creditors property to the amount of two thousand dollars in the possession of each debtor who is a householder or head of a family, and permits him to appropriate it to his family. It may be the very property upon which credit was given, and upon the faith of which the debt was contracted, that is thus appropriated. It may that the “homestead” which the debtor is permitted to “ lay off and assign” to himself, was purchased with money which was borrowed from his-, creditor. It may be the debt contracted enabled him to maintain and educate his children. However sacred the, obligation, however binding upon the highest principles *297 of morality and honor, he is permitted by this law to appropriate to himself property which rightfully and lawfully belongs to his creditor. At the time the contract was entered into every dollar of this property was bound for the debt. The right of the creditor was to subject it by legal process to the payment of his debt. To appropriate it to the use of the debtor or his family was made by law a fraud upon the rights of the creditor. This right, and the laws in existence at the time for its enforcement, were as much a part of the contract, a part of the obligation, as if they were written out as a part and parcel of the stipulation. between the debtor and creditor. And yet it is pretended that because the States have, from motives of humanity, exempted from execution certain articles of necessity, they may, on this idea of legislative discretion, swell the amount to thousands, and, indeed, exempt, in the majority of cases, the whole property of the debtor, and thus cancel by legislative enactment every debt that he owes.
I think it is safe to assume that nine-tenths of the debtors of the State are not owners of more than $2,000 worth of property. So that the effect of the “homestead exemption” would be practically to relieve nine-tenths of the citizens of the State from the payment of all their debts, while the remaining tenth must pay to the last dollar every debt they ever contracted. Such partial and class legislation ought not to be tolerated, unless it can be clearly sustained by the law and the constitution.
One of the counsel for the appellants, while he insisted that the question as to what amount of the debtor’s property ought to be exempted, was a matter of legislative discretion, yet admitted that the legislature ought to exercise a reasonable discretion, and argued that, under the peculiar circumstances of the country, the sum of $2,000 was as reasonable as the exemptions made under former laws. I have already shown that all exemption *298 laws passed in this State, except the one now- under consideration, were always prospective; and I have attempted to show, that every law which withdraws any part of the debtor’s property from the reach of the creditor, which was liable to execution at the time the contract was made, is unconstitutional and void. It may be instructive, as illustrating the extreme result to which this view of the counsel would lead, to refer to a few facts and statistics which bear upon the question as to whether the exemption by the statute under consideration is a reasonable one. The whole population of this State, according to the census of 1870, is one million two hundred and twenty-five thousand. It is safe to assume that one-sixth of the whole population are householders or heads of families, which gives, in round numbers, say, two hundred thousand as the number. Multiply 200,000 by 2,000, and we have $400,000,000 of property in this State exempted from execution. According to the last auditor’s report, the whole value of all real estate in Virginia is $276,116,000, and of personal estate $86,321,708, making the aggregate value of the real and personal estate $365,487,708. The “homestead exemption,” allowing each householder or head of a family to set apart for his own use, and the use of his family, $2,000 of his property, thereby exempts from execution, and withdraws from the reach of creditors, property in this State to the amount of $400,000,000, which is over $120,000,000 more than the value of the whole real estate in the limits of the commonwealth, and is over $300,000,000 more than the value of the whole personal estate owned by all the people of the State. And yet, in the face of such an exhibit as this, it is argued that the legislative discretion (which, it is insisted, controls this subject) has been reasonably and fairly exercised. It seems to me these figures show that such exemption, so far from being reasonable, amounts to absolute repudiation. It is no answer to this startling *299 exhibit to say that each “householder or head of a family” is not possessed of $2,000 worth of property. This is true ; but, under the law, his future acquisitions to that amount may be appropriated to himself and withdrawn from the reach of his creditor, so that the practical effect is to release this enormous amount of property from the enforcement of contracts and the payment of debts.
There is one other view of counsel, which I propose briefly to notice. Much has been said in argument, about the debtor class and the creditor class, and attempts are made to array one against the other, and counsel have indulged in impassioned appeals in favor of the one and denunciations against the other. This tribunal cannot listen for a moment to such arguments and such appeals. Ho class and no distinction among the citizens of the commonwealth can be recognized here. Whatever the consequences may be, our province is to declare what the law is. This we must do firmly and fearlessly, without regard to the interests of one or another class, without regard to the disasters or benefit which may result to the one or the other from our decision.
But the truth is, there is no such thing as a “ debtor ■class and creditor class” among the people of the State, in the sense in which this expression has been used. In the great majority of cases, every man is both a creditor and a debtor, and in many cases if the debtor could receive what is due to him, he would be no longer a debtor, for he would have the means of paying his debts without ■selling his property. And I am persuaded that no such disastrous consequences as those depicted by counsel will flow from a judicial sentence against the validity of the homestead exemption. The great bulk of the indebtedness of the people is due to the people of the State, and not to citizens of other States. The latter class of debts have long ago been adjusted and compromised. And while such indebtedness to each other is, undoubtedly, heavy and burdensome, it will require a much smaller *300 sum to discharge the whole than is generally supposed. Where A pays his debt to 13, it enables B to pay his debt to 0, and so to the end of the alphabet. So that an insignificant sum may discharge an enormous amount of the aggregate debt of the whole people.
I feel, too, an abiding confidence in the hope and the belief that debtor and creditor will meet together in a spirit of compromise and fair dealing; and under the influence of those kindly and humane sympathies which should characterize men who have risked so much and lost so much in a common cause, and who have been whelmed in- a common ruin, much of the calamity and suffering so eloquently depicted by counsel may be averted.
But whatever may be the consequences; how?ever great the sufferings of individuals ; however wide-spread the ruin growing out of a sacrifice of property, and causing universal bankruptcy ; however all this might affect our sensibilities as men ; yet as the expounders of the laws and constitution for this high tribunal of the last resort, we must uphold wuth stern inflexibility and unflinching fidelity, the requirements of those laws and the mandate of that constitution, as the only safeguards of private^ rights and the only protection of a well-ordered society.
And better, far better, for the people of this commonwealth, for social progress and enduring prosperity, would be temporary, though universal, bankruptcy, than the bankruptcy of public morals and the destruction of public and private faith, which laws like the one under consideration, upheld by a subservient judiciary would surely engender. Better, far better, that poverty and adversity should be patiently endured for a time than by temporary expedients, which violate the high morality of the law and the wise restraints of the constitution, to engender a disregard of private rights, the repudiation of public and private obligations, the want of confidence between man and man, and to cultivate and encourage among the people a want of respect for those laws and that consti *301 tution, whose wise restraints'and fundamental guarantees can only secure their prosperity and happiness, and which, constitute the bulwarks of their protection. No State and no people can have real and enduring prospertiy, except where public faith and private faith are guarded by laws wisely administered and faithfully executed.
The inviolability of contracts, public and private, is the foundation of all social progress, and the corner-stone of all the forms of civilized society, wherever an enlightened jurisprudence prevails. In our system of government it has been wisely placed under the constitution of the United States, and there it rests secure against all invasion.
It only remains for me to say that after careful consideration of the important question before us, and deeply impressed with the responsibilities which grow out of it, I am of opinion that the provision of the State constitution and the act of the General Assembly passed in pursuance thereof, known as the homestead exemption laws, so far as they apply to contracts entered into or debts contracted before their adoption, are in violation of the constitution of the United States and, therefore, void. The judgments in each case must be affirmed.
The other judges concurred in the opinion of Christian, J.
Judgments and decree arrirmed.