Staples J.
Before considering the main question arising in this case, it is proper to notice a preliminary objection to the jurisdiction of the court. It is insisted, that this is a single creditor’s bill, brought to enforce a legal demand, as to which there is no obstacle in the way of a recovery and relief in a court of law.
The bill alleges there is not personal property belonging to Duerson’s estate, in the hands of his administrator or under his control, sufficient to satisfy the debt claimed by the appellee, and it asks for a decree subjecting the real estate in the possession of the heirs to sale for that purpose. It further asks, that the administration account may be settled; that an account of all the debts and liabilities of the estate may be taken, and their priorities fixed; and that all other accounts and orders which are proper in the cause may be taken and made.
Under this prayer a decree for a general account may be entered, all the creditors permitted to come in and prove their debts, an order entered staying all other suits, and all the assets administered in the one *236 suit. The bill is therefore substantially a creditors’ bill, although it does not profess to be filed in behalf of all the creditors of the decedent.
Whatever doubt there may be as to the • right of a single creditor at large to bring a suit in a court of equity for an account of assets and the payment of his debt, there is no difficulty as to the jurisdiction where the bill is filed in behalf of the complainant and all other creditors who may come in and prove their claims. Poindexter’s ex’ors v. Green’s ex’ors, 6 Leigh 504; Wilkins v. Finch, adm’r, Philips Eq. 355. Upon such a bill a general account of the assets is ordered, the priority of debts and liens ascertained and settled, multiplicity of suits avoided, and final and complete relief administered.
Although the bill in such case is in behalf of all the creditors, it is yet under the control of the party bringing it, at least until there is a decree for an account. If his claim is proved or admitted, and the executor confesses assets, the plaintiff may at the hearing have a decree for payment, and he is not compelled to take a decree for an account. Daniel Ch. Prac. 236; Adams Equity 257, 258.
In this case the administrator admits assets under his control sufficient to pay all the liabilities of the estate. They consist, however, almost entirely of choses in action upon which judgments have been recovered. If the appellee had sued at law a recovery there would not have availed him, as no execution could have been levied upon such choses in action.
At the time of filing the bill, the appellee could not know the precise condition of the estate, the nature and extent of its liabilities. He had therefore a right to file his bill asking a discovery of assets and an account. The administrator having confessed assets suf *237 ficient when collected to satisfy the appellee’s demand, it was the privilege of the latter to waive the account, and take a decree for payment out of these assets, a right to apply to the court for any additional relief which might become necessary. In all this the proceeding was in conformity with the practice and the established doctrine of the equity courts.
The main question in this case is, whether the rights and obligations of the parties are governed by the ordinance of the Virginia convention adopted on the 24th of June 1861, or by an act of the legislature passed on the 16th of May 1862, amendatory of the provisions of the ordinance.
The effect of the ordinance was to 'dispense entirely with demand, protest and notice upon all checks, bills and notes payable at a bank located in any city or town, if at the time of the maturity of such instruments the town or city was occupied, invested, or access thereto interrupted by the public enemy.
The effect of the act of the legislature, on the other hand, was to require notice of dishonor of the bill or note to be given within ten days after the removal of the obstruction created by the presence of the enemy.
The note, which is the subject of controversy, was made on the 10th of December 1861, whilst the ordinance was in force. It fell due on the 10th June 1862, after the ordinance had ceased to operate, and whilst the act of May 1862 was in full force. At the time of the maturity of the note the town of Fredericksburg was in possession of the federal forces, and consequently no demand was ever made, or notice given of the dishonor of the note. Under this state of facts, if the ordinance of the convention controls the rights of the parties, the holder of the note is entitled to recover, notwithstanding the failure to make demand and give *238 notice of non-payment. If the act of May 1862 governs, the indorsers are discharged by reason of the failure of the holder to comply with the provisions of that act.
This question is to be solved by determining whether demand and notice are regulated by the laws in force when the endorsement is made, or by those in force at the time of the maturity of the note. The learned counsel for the appellant maintains that the proceedings to be taken upon the dishonor of a negotiable note, with a view to fix with liability the indorsers, is the law of the place, and the time when and where such dishonor takes place. In support of this proposition much reliance is placed upon two cases. One of these is Barlow v. Gregory, reported in 81 Conn. E. 261. It was there held, that a statute establishing a legal holiday was applicable to antecedent transactions, and did not impair the obligation of the contract, although the effect might be to exclude one of the days of grace to which the maker of a negotiable note was entitled. This decision was placed mainly upon the ground, that laws establishing legal holidays are in the nature of police regulations, and may be sustained upon the score of public health and morality; that days of grace constitute no part of the original contract, but are mere matters of indulgence granted the debtor, in regard to which the parties have made no stipulation; and further, that in looking forward to the time of payment, the parties are required to have respect to the general holidays which may then be established, and they are presumed to contract with reference to the custom of observing such holidays.
ÍTow what is said by the learned court with respect to the allowance of days of grace, as a mere matter of *239 favor to the debtor, is undoubtedly correct; but when it is asserted that the parties have made no stipulation with reference to days of grace, the proposition is sustained by the authorities. On the contrary, nothing is better settled than that the usage in regard to the allowance of days of grace, prevailing at the place of payment, is a part of the contract. Jones v. Fales, 4 Mass. R. 245; Planters Bank v. Markam, 9 How. Miss. 405; Mills v. Bank of the United States, 11 Wheat. 431; Ogden v. Saunders, 12 Wheat. R. 213, 342; Story on Prom. Notes, sec. 215, note.
Be this as it may, the Connecticut court having reached the conclusion that the allowance of days of grace is no part of the original contract, it could of course have no difficulty in arriving at the further conclusion, that one of these days might be excluded from the computation by the occurrence of a legal holiday, ■established even after the execution of the note.
But the court does not say, that demand and notice, and the circumstances under which they may be required or dispensed with, are not incidents of the original contract, or that they are governed by the laws in force when the notes become payable, or that the parties are presumed to contract with reference to such laws. The decision is confined to the narrow ground, that as the observance of holidays tends to the preservation of public health and morals, the parties in making their contract are required to have respect to such as may from time to time be established by law. Thus restricted, there is perhaps no particular objection to the dictum laid down by the supreme court of Connecticut.
The other case cited by the learned counsel is that of Rouquette v. Overman, decided by the court of queen’s bench, and found in the Law Eeports 1875,10 Queen’s *240 Bench L. B. 525. The action was upon a foreign bill of exchange, drawn and endorsed in England, upon a. house in Paris, and accepted there. ’ The national assembly of Erance having by various decrees or orders extended the time of payment upon bills of exchange in consequence of the existence of the German war, the bill in controversy was not protested,' nor was notice given of its dishonor until the expiration of the time fixed by the legislative decree. The question before the court was, whether the indorser, residing in England, was bound by the law of Erance made after the date of his indorsement, or must be discharged by the failure to make protest and give notice at the-maturity of the note. It was held that the indorser was not discharged. Chief Justice Gochburn, in delivering the opinion of the court, sets out with the concession, that although time of payment is the essence of the contract, it was competent for the sovereign power of Erance to change or extend it at its pleasure, so far, at least, as subjects of that country were concerned. He then proceeds to show, that as the holder of the bill could not be required to present it to the acceptor for payment until it became legally payable according to the law of the place where payable, so he could not be required to give notice of dishonor until payment had been legally demanded of the acceptor and refused. And as the acceptor resided in France, and as according to the law of that country payment could not be legally demanded of him until the day fixed by the legislative decree, there could of course be no protest and no notice given the indorser until then.
How it is very clear, that no such case as this could have arisen in Virginia since the adoption of the federal constitution; for the obvious reason that a law *241 changing the time of payment fixed by the parties would be treated as a law impairing the obligation of the contract. And yet the acknowledged, power the government of France to pass such a law was the basis upon which the entire argument of the learned judge was founded. He did not maintain that the indorser had contracted with reference to some new law which might be in operation when the bill matured. The decision is based upon the idea, chiefly, that as the liability of the indorser is to be measured by that of the acceptor whose surety he is, it followed that an indorser residing in England might be reached by a law of France through the medium of the acceptor who resided in France.
It will be seen from this simple statement, I am not called on to controvert the decision of the queen’s bench or the reasoning upon which it is based.
It is worthy of observation, however, that the decision is in direct conflict with that of the supreme court of the United States in the case of Musson v. Lake, 4 How. U. S. R. 262.
The great question in that case was whether the contract between the holder and indorser was to be governed by the law of Louisiana, where the bill was payable, or by the law of Mississippi, where it was drawn .and indorsed. The supreme court of the United States, after stating the proposition, that due presentment of a foreign bill of exchange to the drawee, protest and notice are conditions entering into and making a part of the contract between the parties, and that the law imposes the performance of them upon the holder as conditions precedent to the liability of the indorser—say, “The acceptors resided at New Orleans: they became parties to the bill by accepting it there. So far, therefore, as their liabili *242 ties were concerned, they were governed by the law of Louisiana. But the drawer and indorsers resided in Mississippi: the bill was drawn and indorsed there, and their liabilities, if any, occurred there. The undertaking of the defendant was, that the drawee should pay the bill; that if the holder- after due diligence failed to obtain payment from them, he would pay it, with interest and damages. ..This part of the contract was, by the agreement of the parties, to be performed in Mississippi, where the suit was brought. The construction of the contract, and the diligence necessary to be used by the plaintiffs, to entitle them to a recovery,-must therefore be governed by the laws of the latter state. The laws of Louisiana could not affect the contract of the parties residing in Mississippi.” In support of this view numerous cases are cited by the learned judge delivering the opinion.
The questions arising in the two cases just cited have been the prolific source of controversy among judges and writers on commercial law in every country where that law is recognized. That controversy does not, however, turn upon the question whether the rights and liabilities of the parties are governed by laws in force when the indorsement is made, or by those in force when the bill matures. The real point of contention is, whether the contract of the indorser is to be considered as made with reference to the law of the place where the indorsement takes place, or with reference to the law of the place where the note or bill is to be paid. But whichsoever it may be, whether the law of the place of indorsement or the law of the place of payment is to govern, the rights and obligations are to be determined by existing laws, the laws in force when the contract is made. It is with reference to these the parties are presumed to con *243 tract, and not with reference to some future laws of which they can know nothing.
"Wherever the law merchant prevails, demand and notice are incidents of the contract of indorsement; they are conditions precedent to a right of recovery •on the bill or note. This position is sustained by abundant authority.
In Rothschild v. Currie, 41 Eng. Com. Law R. 43, a case much relied on in the ai’gument, Lord Denman, chief justice, said: “Is then notice of the dishonor parcel of the contract? The manner in which by the 165th section it is connected with the citation in judgment would at first raise an impression that it was not, but only a step in the remedy at law; but, upon consideration, we think it is parcel of the contract. The indorser contracts to pay the bill, not primarily or absolutely, but on two conditions: one, the dishonor by the drawee or acceptor; the other, the due notification to him of such dishonor.” This, it will be conceded, is very high authority. The authority of the case has been questioned in other respects, but the soundness of the view just stated has not been expressly denied by any case I have seen. See also Berry v. Robinson, 9 John. R. 121; Aymar v. Sheldon, 12 Wend. R. 439; Story’s Conflict of Laws, sec. 360; 1 Rob. Prac. 79; Williams v. Wade, 1 Metc. R. 82; Short Co. v. Trabue & Co., 4 Metc. R. 299.
In Ogden v. Saunders, 12 Wheat. R. 213, 341, Chief Justice Marshall, speaking with reference to the drawer of a bill of exchange—and the remark is equally applicable to the indorser—said, he ought to have notice that bis bill is dishonored, because this notice enables him to take measures for his own security. It is reasonable that he should stipulate for this notice and the law presumes that he did stipulate for it.”
*244 But if the argument made here in behalf of the appellant be sound, while the indorser stipulates for notice as a measure essential to his security, he at the same time agrees that he will dispense with it provided the legislature (as has been done in one of tho states) abolishes the law merchant before the maturity of the bill or note. And so the holder agrees that he will make demand of payment and give due notice of the dishonor; but it is said he at the same time impliedly agrees to do some other act if the legislature should, in the meantime, require it: what it is of course is wholly unknown to him. What confidence can be placed in negotiable instruments clogged with conditions of this character. The great value of these securities is, that they are governed by well established rules of law recognized throughout the commercial world, and well understood by the parties at the time of assuming their respective liabilities.
It is no answer to this view to say, that such changes will be rarely made in the law, so as to affect antecedent contracts. The mere recognition of such a doctrine will be mischievous in the extreme. Experience attests that laws materially affecting vested rights are not unfrequently passed through legislative bodies without discussion or even suspicion of their nature and effect. In cases of negotiable securities, the inducements to such legislation would be peculiarly great. Under the operation of a statute imposing new duties in regard to demand and notice, of which parties in distant states can know nothing, securities to the amount of millions may be rendered absolutely worthless. In all other transactions mankind are presumed to contract with reference to existing laws. In the language of a distinguished writer, “These are necessarily referred to in all contracts, and forming a *245 part of them as the measure of the obligation to perform, by one party, and the - rights acquired by the other.” Cooley on Con. Limitation 284; Sherrill Hopkins, 1 Cow. R. 103, 107; Don v. Lippmann, 5 Clark & Lin. R. 1-13; Homestead cases, 22 Gratt. 266.
There is no valid reason why a different rule should be accepted with respect to negotiable instruments. On the contrary, every consideration of sound policy requires that the principle should be applied in its utmost rigor to these securities.
The case in hand strongly exemplifies these views. The ordinance of the convention, already mentioned, provides, that where any city or town, in which a bank is located, shall be occupied by the public enemy, the parties to negotiable paper payable in such town or city shall remain bound after the maturity of the paper, without demand, notice or protest, as if they had been regularly made or given. Parties making or indorsing notes or bills, after this ordinance went into operation, are presumed to know of its existence. They are supposed to contract with direct reference to its provisions. It entered into and became an essential element of the contract. It is as if the indorser had agreed in writing with the holder,'that in the contingency mentioned he would waive demand, protest and notice. Suppose he had in fact done so, in the absence of an ordinance, will it be maintained that it was competent for the legislature by a subsequent enactment to require that notice should be given as a condition precedent to a right of recovery ? And yet the waiver in the present case is as positive and unmistakeable in its terms as though it had been written at large on the paper containing the promise to pay. The bank might well say, it would not have discounted the note, the holder might say he would not have pur *246 chased it in those unsettled times, but for the security afforded by the ordinance. Both might well say, that they rested with absolute confidence upon this security, and failed to give notice of the dishonor; that they never knew of the existence of the act of May 1862' in sufficient time to conform to its requirements; or, if they did, they were under no obligation to regard it; for, if the act was to be construed as applying to-antecedent transactions, it was an effort of the legislature to impose conditions not expressed in the original contract.
It is to be observed that the act in question is not-simply a repeal of the ordinance, not the restoration of the law merchant. It is the adoption of a new rule different from the law merchant, different from the ordinance. Under that act it was not sufficient to give notice of the dishonor of the note within a reasonable-time after the removal of the impediment, but a peremptory limit of ten days was prescribed, applicable alike to each and every case, without regard to the circumstances which might surround the holder or the state of the country.
It is difficult to-believe that the legislature could ever have designed that this law should apply to bills and notes executed previous to its enactment. If such was the purpose, the effect was to impair the obligation of the contract, and to violate the constitution.
Since the foregoing was written I have examined the decision of this court in the case of Farmers Bank of Va. v. Gunnell’s adm’or, made at the March term 1876, and not yet reported. That decision will be found to sustain the views already presented in regard to the ordinance of the convention, and upon the question of the steps to be taken upon the dishonor of a negotiable note.
*247 The learned counsel for the appellant, both in the petition for an appeal and in his oral argument, has maintained that the convention of 1861, having legislative power, could not pass a “valid ordinance of the character at present under consideration.
The act of the Virginia legislature calling a convention was ratified by the people. That act, among other things, provided that the members of that body after assembling in Richmond “shall proceed to adopt such measures as they may deem expedient for the welfare of the commonwealth.” These are very comprehensive terms: they show that the design was not to confine the convention merely to the consideration and adoption of such measures as affected the relations of the state with the federal government, but to confer upon it important powers affecting the internal affairs, the domestic economy of the commonwealth. The measures to be adopted from time to time by the convention must, of necessity, have included many matters of ordinary legislation. It was necessarily, to a very great extent, the judge, and the exclusive judge, of what was essential and proper to be done under all the circumstances surrounding the state. The courts would hesitate long before undertaking to declare that a body thus constituted had transcended the just limits of its authority. It could only be done where the act was a palpable invasion of the reserved rights of the people.
Large and numerous classes of the people were interested in the banks. The state was vitally concerned in their just and wise administration. These institutions were important agencies in the fiscal affairs of the commonwealth, in supplying both people and government with a sound currency. In the then existing condition of affairs, with invading armies *248 occupying many of the towns and cities of the state, and threatening others with incessant raids, some such provision as that adopted by the convention might justly have been regarded as expedient both for the commonwealth and the banks. At the time of the adoption of the ordinance the legislature was not in session, and the convention was necessarily required to adopt many measures more appropriate perhaps to an ordinary legislature. Without therefore entering into a discussion of the question of the powers of a convention to exercise the functions of a legislative body, under ordinary circumstances, it is sufficient to say that the convention of 1861 did not exceed its powers in adopting the ordinance now under consideration.
The next and only question to be considered, Í3 as to the right of the appellee to recover without proof that he has paid value for the note. As a general rule the possession of a negotiable instrument is prima fade evidence of a good title. And although it may be an accommodation note, the holder is presumed to have given value for it. On the other hand, circumstances may be shown to exist which will remove this presumption, and cast upon the holder the onus of proving that he is a holder for value.
In Mills v. Barber, 1 Mees. & Wels. R. 425, it was held that if the instrument be connected with some fraud, and a suspicion of fraud be raised from its being shown something has been done with it of an illegal nature, as that it has been clandestinely taken, or has been lost or stolen, in such case the holder must show that he has paid consideration for it.
And in another ease where the drawer of the bill proved that he indorsed it in blank, and delivered it to W to get it discounted for him; which W promised *249 to do, and bring him the money on the following Monday; but never returned with the bill or the money, and the drawer heard no more of it •called upon by H to pay it; it was held that BT must prove that he gave consideration for the bill. Hall v. Featherstone, 3 Hurl. & Nor. 284; Story on Bills Sec. 193, note.
In the nature of things it is impossible to lay down any fixed unvarying rule, as to the circumstances which will be deemed sufficient to throw upon the holder the burden of showing that he has given value for the note. The courts must determine in each case, whether the transaction is of such a character as to rebut the presumption usually arising from the possession of the instrument.
The note which is the subject of the present controversy matured in June 1862. When or how the appellee obtained possession of it, does not appear. He does not state what consideration he paid for it, or indeed that he paid any consideration at all; although his long delay rendered some explanation of the kind peculiarly proper and even necessary. The only statement bearing upon this point contained in the bill is, that John J. Chew made the note on the 11th Decemher 1861, payable to the order of George F. Chew and Eobert C. Duerson; and that afterwards the said Chew and Duerson indorsed the same to the appellee. It is not very clear from this, whether the appellee •obtained the note from the indorsers or from the maker. The fair • implication is, that it was the former, and yet it is manifest from the face of the note itself, it was accommodation paper for the benefit of the maker. The note, although payable at the bank in Fredericksburg, was never placed in that bank; and, so far as this record discloses, has never been *250 seen by any one, or even beard of, since the date of its execution, until very shortly before this suit was brought, in December 1870. Duerson, one of the indorsers, against whose estate this claim is asserted, died in 1863. George F. Chew, it seems, is also dead: when his death occurred does not appear; it was certainly before the institution of the suit. John J. Chew, the maker, it would seem, even after the close-of the war, was possessed of sufficient property to pay the note. He died in the year 1870, utterly insolvent. Notwithstanding all the parties lived in or near Fredericksburg, notwithstanding the death of maker and indorsers, and the failure or threatened distribution of their estates, the appellee, from 1862 to 1870 inclusive, so far as the record informs us, never disclosed to any one that he was the owner of this large debt. It was not until the death of every person who could throw any light upon the transaction, that he brings forward the note, and claims to recover against one of the indorsers. Yery curious to say, these eircumstancesseem to have attracted but little attention in the court below. They are alluded to in the answer of Duerson’s administrator, not so much to throw discredit upon the title of the appellee, as to fix upon him the-imputation of gross laches in the assertion of his demand to the manifest prejudice of the indorsers. The appellee having brought his suit within the time allowed by the several statutes passed since the war, I do not perceive how he can be barred upon the ground of any supposed laches. But his long delay in connection with the other circumstances, already alluded to, removes the presumption arising from the mere-possession of the note, and makes it incumbent upon him to show that he paid consideration for it, or at' least facts and circumstances, from which it may bo inferred that he has paid such consideration.
*251 I do not think the bill ought to be dismissed by this court, because it must be admitted that the pleadings and issues in the court below do not appear to distinctly presented this point. It was for the first time raised by the learned counsel for the appellants in his argument here. The appellee should therefore have an opportunity of showing, if he can, that he has paid consideration for the note. With that view the decree of the circuit court is reversed, and the cause remanded for an issue, to be tried by a jury, or for an inquiry before a commissioner as to that court may seem best under all the circumstances.
The other judges concurred in the opinion of Staples, J.
The decree was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that the circuit court erred in decreeing in favor of the appellee, without requiring him to show that he is a holder for value of the note in controversy, and without also requiring the appellee to make the representatives of John J. Chew and of George F. Chew parties to the suit.
It is therefore decreed that for the said errors the decree of the said circuit court be reversed and annulled, and that the appellee pay, &c.
It is further decreed, that the cause be remanded to the said circuit court, in order that the proper parties may be made, and the appellee may have an opportunity of establishing by proper proof that he is such holder for value. And to that end the said circuit court may direct an inquiry before one of its commissioners, or an issue to be tried before a jury, as it may deem most advisable.
Decree reversed.