79  123
96  821

79  123
97  300
97  301

79  123
106  326

## Richmond.

### BLACK v. TROWER AND ALS.

May 8, 1884.

1. CONSTITUTIONALITY—*Electoral Boards—Freehold qualification.*—Act of February 14th, 1884 (Acts 1883-4, p. 150), prescribing that members of ·electoral boards shall be freeholders, contravenes Va. Constitution, Art. III, .sec. 2, which declares that "all persons entitled to vote shall be eligible to any office within the gift of the people," and is void.

2. IDEM—*Acts partly constitutional.*—A statute may in some of its provisions be constitutional and in others not. If the unconstitutional be so connected with the constitutional that the one would not have been enacted without the other, the whole is void.

3. CONSTRUCTION.—In said second section, the words· "office within the gift of the people," include all offices, as well those filled by the legislature as those filled by popular vote.

Petition for a writ of *mandamus.*  Opinion states the case.

*D. J. Godwin, Christian & Christian,* and *Crocker,* for petitioner.

*Pegram & Stringfellow, R. C. Marshall,* and *L. R. Watts,* for respondents.

LEWIS, P., delivered the opinion of the court:

This controversy involves the title to the office of registrar for the first precinct of the first ward of the city of Norfolk. The petitioner's claim is founded on an appointment by the cor-

poration court of that city. The respondent, Trower, claims by
virtue of an appointment by the so-called electoral board of
that city, made on the —— day of March, 1884. The members
of that board, who are the respondents Cook, Smith and Dalton,
were elected by the legislature pursuant to the provisions of an
act entitled " an act to provide for the manner of choosing
registrars, judges, and clerks of election," &c., in force February
14, 1884. Acts 1883–84, page 150, *et seq.* The first section of
the act enacts that the general assembly shall once in every four
years elect three qualified voters, who shall be *freeholders* and
residents of each county and city for which they are appointed,
to be known as the county or city electoral board, and who shall
take the usual oath of office prescribed for city and county offi-
cers. And by subsequent sections it is made the duty of the
electoral boards to appoint for their respective cities and coun-
ties the registrars and other election officers provided for by
the act. The act repeals sections 8 and 24 of chapter 8, and
sections 2 and 3 of chapter 7 of the Code of 1873, and all acts
and parts of acts in conflict with its provisions. The 13th sec-
tion excludes from the operation of the act the city of Norfolk ;
but this section has since been repealed. Acts 1883–84, page
229. The constitutionality of the act is denied by the petitioner
because of the freehold qualification it prescribes for members
of the electoral boards; and this is the first question to be deter-
mined.

We are of opinion that the petitioner's contention is well-
founded. The constitution declares that "all citizens of the state
* * * possess equal civil and political rights and public privi-
leges." And the language thus employed was plainly intended
not as idle or empty words, but to express a principle which lies
at the very foundation of the government; for it is further or-
dained that the equality of rights and privileges thus declared
to exist " shall not be violated on any pretence whatever."
Art. I, sections 20, 21. It is manifest, therefore, that the framers
of the constitution, and those who adopted it, intended to estab-

lish a government not republican in form merely, but with powers limited and defined, and with ample guarantees for the equal protection of the rights it was designed to secure. And hence it follows that a statute which discriminates in favor of one class against other classes of citizens in respect to eligibility to office, or otherwise in respect to public privileges, cannot be sustained unless authorized by the constitution itself, either expressly or by necessary implication. For if a right conferred by the constitution were not beyond the reach of legislative interference, the constitutional guarantees would be a dead letter, and the legislature instead of being controlled by, would be superior to the constitution, and unrestrained in the exercise of its power. We would therefore feel constrained to hold the act invalid, even if there were nothing more in the constitution on the subject than the provisions already quoted. But the constitution goes further. It defines the qualifications, but does not require a freehold qualification for voters, and then declares that "all persons entitled to vote shall be eligible to any office within the gift of the people, except as restricted in this constitution." Article III, section 2. Here it is evident that the framers of the constitution, having recognized the civil and political equality of all citizens of the state, intended to make eligibility to office (except as restricted in the constitution itself) co-extensive with the right of suffrage; and, accordingly, the provision finds an appropriate place in that article of the constitution which relates to the elective franchise. Now, it is a well established rule of construction, as laid down by an eminent writer, that when the constitution defines the qualifications for office, the specification is an implied prohibition against legislative interference to change or add to the qualifications thus defined. Cooley's Const. Lim. (4th ed.) 78. And among the cases to which the author refers is *Barker* v. *The People*, 3 Cowen, 686, decided in 1824. In that case the chancellor, delivering the opinion of the court of errors of New York, said: "The legislature cannot establish arbitrary exclu-

sions from office, or any general regulation requiring qualifications which the constitution has not required. If, for example, it should be enacted by law that all physicians or all persons of a particular religious sect should be ineligible to public trusts, or that all persons not possessing a certain amount of property should be excluded, any such regulation would be an infringement of the constitution; and it would be so, because should it prevail, it would be in effect an alteration of the constitution itself."

It is contended, however, that an "office within the gift of the people" is an office to be filled by popular vote, and not one to be filled by the general assembly. But this we think, is an erroneous construction and contrary to the manifest intent of the framers of the constitution. The words "the people" are not unfrequently employed in different senses, and their meaning must therefore be determined by the connection, and the circumstances of the particular case, in which they are used. In some cases they refer to the qualified voters, and in others to the state in its sovereign capacity. An example of the latter kind is found in the preamble to the Constitution of the United States, which declares that "we the people of the United States, in order to form a more perfect union * * * do establish this constitution," etc. Here the words refer, not to the qualified voters of the various states, for the constitution was never submitted for adoption to a popular vote, but to the whole body of the nation at large. And in this comprehensive sense it is plain the words were used in the article of the constitution now under review, especially when construed, as they must be, in connection with the provisions already quoted and the further declaration that " *all* power is vested in, and consequently derived from, the people ; that magistrates are their servants, and at all times amenable to them." Art. I, sec. 4. It is easy to see how, if the construction for which the respondents contend were to prevail, the legislature might by creating offices and prescribing qualifications not found in the constitution, effectually confine within

a comparatively small circle a large portion of the powers of the state government; for if it may prescribe a freehold qualification for office, it may declare that none shall be eligible whose freehold estates are of less value than $100,000, or that only persons of a certain race or color or profession shall be eligible, and thus in a most important particular, deeply affecting the interests of the people, violate the equality of rights and privileges guaranteed by the constitution. Clearly it is not within the power of the legislature thus to limit the range of selection of public officers; and the act in question is in contravention no less of the rights of the public at large, than of those citizens of the state who are wrongfully excluded by its provisions.

But while this, as a general proposition, is undoubtedly true, we do not mean to assert that the rule is universal and inflexible. Thus, for example, it may be conceded that the legislature may require the office of public printer to be filled by a practical printer (Code 1873, chap. 19, sec. 3), or that the state board of health shall be composed of physicians (Id. chap. 84, sec. 1), or that the judge of a city court shall possess the same qualifications as those prescribed by the constitution for circuit judges (Id. chap. 154, sec. 22). For in such cases the duties to be performed are of a peculiar and professional character, and the qualifications prescribed are essential to their performance. The power to prescribe them may therefore be said to exist by fair implication. But no such reason can be urged in support of the act prescribing a freehold qualification for members of electoral boards. Such a qualification is not essential to the discharge of the duties imposed by the act, and is not sanctioned by constitutional authority, express or implied.

But it is argued that, conceding this to be so, the residue of the act is constitutional, and must be sustained. It is true that a statute in some of its provisions may be unconstitutional and void, and in others valid and enforceable. The Homestead cases, 22 Gratt. 266. But when the valid part is so connected with and dependent on that which is void, as that the parts are not

distinctly separable, so that each can stand alone as the will of the legislature, the whole must fall.   Cooley's Const. Lim. (4th ed.) 177 ; *Warren* v. *The Mayor, &c.,* 2 Gray, 84 ; *State of Nevada* v. *Hallock,* 14 Nev. 202 ; *Hinze* v. *The People,* 92 Ill. 406 ; *Slauson* v. *The City of Racine,* 13 Wis. 398 ; *Tims* v. *The State,* 26 Ala. 165.

In passing the act in question, it was the evident purpose of the legislature not merely to substitute a new plan for the appointment of registration and election officers in place of that which had theretofore been provided by law, but for reasons satisfactory to itself, and as an essential part of the intended substitute, to place the power of appointment in the hands of freeholders.   The requirement that the electoral board shall be composed of freeholders, is equivalent to a declaration that none but freeholders shall be chosen by the legislature, and there is nothing in the act to warrant the belief that it would have been passed at all, except as an entirety and in the form in which it is.   To hold, then, in accordance with the view which has been urged for the respondents, would be in effect not only to make a statute, but one which it cannot be assumed the legislature would have been willing to make.   This the courts have no power to do, and the matter must be left to the consideration of the legislature.   This principle is illustrated by a recent decision of the supreme court of the United States, where an act of congress which, it was claimed, would have been valid as a regulation of commerce with foreign nations and among the states, was held to be void altogether, because it embraced all commerce, including that between citizens of the same state, which was not within the jurisdiction of congress, and its language could not be restrained to that which was subject to the control of congress.

The court said: "If we should, in the case before us, undertake to make by judicial construction a law which congress did not make, it is quite probable we should do what, if the matter were now before that body, it would be unwilling to do."   Trade

Mark Cases, 100 U. S. 82. And to the same effect are numerous cases.

We are, therefore, of opinion that the entire act is inoperative, and that the statutes sought to be repealed are unaffected thereby. For it cannot be supposed that the legislature designed to repeal the statutes relating to elections and the appointment of registrars and officers of election, except upon the condition that effect could be given to the proposed substitute as a constitutional and valid law. And as this cannot be done, it follows that the election of the respondents, Cook, Smith and Dalton, and their subsequent appointment of the respondent, Trower, as registrar, was without authority of law; that the petitioner is lawfully entitled to the office in dispute, and that the writ must be awarded according to the prayer of the petition.

HINTON, J., dissented.

MANDAMUS AWARDED.