## HOPKINS AND OTHERS V. CITY OF RICHMOND, AND COLEMAN V. TOWN OF ASHLAND.

### September 9, 1915.

1. CONSTITUTIONAL LAW—*Statute Valid in Part—Segregation Ordinance.*—Although the same section of a segregation ordinance applies to two classes of persons, the one having the right of occupancy of property at the time the ordinance was adopted and the other acquiring such right thereafter, the two may be separated and the ordinance upheld as to the latter class, though invalid as to the former. The provisions for different classes are not interdependent. Nor is the right of the court to sever the classes affected by the mere matter of articulation and phraseology.

2. CONSTITUTIONAL LAW—*Segregation Ordinance—Occupation of Property by Owner.*—The right of the owner of real property to enter into and occupy the same is a vested right, and a segregation ordinance which attempts to deprive one who is such owner at the time the ordinance is adopted from thereafter occupying the same in person, is beyond the police power of the municipality, invalid and inoperative.

3. MUNICIPAL CORPORATIONS—*Segregation Ordinance—Power to Enact—Police Power—Code, Section 1038.*—The cities and towns of this State have the power, as incident to the police powers conferred by section 1038 of the Code, to pass segregation ordinances separating the places of residence of white and colored citizens, respectively, provided the same do not disturb vested rights as shown in paragraph 2 above.

4. MUNICIPAL CORPORATIONS—*Segregation Ordinance—Delegation of Power.*—A municipal ordinance forbidding a white or colored person from taking up his residence on any street on which a majority of the residents are of the other race, is not a delegation by the municipality of its powers to the residents on such street. Such residents have no authority in the premises. The operation of the ordinance does not depend upon the subsequent action or consent of any one, but is effective from its passage.

5. MUNICIPAL CORPORATIONS—*Segregation Ordinance—Police Power Reasonableness.*—A municipal ordinance segregating the places of residence in the municipality of white and colored persons, and determining the same by the race of the majority of residents on a particular street, which is wholly prospective in its operation and does not disturb vested rights as defined in paragraph 2 above, is a reasonable exercise of the police power of the municipality and is a valid enactment. Such ordinances tend to preserve the public morals, public health and public order in the cities and towns of the State.

6. MUNICIPAL CORPORATIONS—*Discretionary Powers—Interference by Courts.*—Courts can interfere only to prevent a fraudulent and manifestly abusive or oppressive exercise of the powers conferred upon the council of a municipality by its charter or the general law, as the discretion of municipal corporations, within the sphere of their powers, is as wide as that possessed by the government of a State.

7. CONSTITUTIONAL LAW—*Police Power—Use of Property.*—Every citizen holds his property subject to the proper exercise of the police power either by the State legislature directly, or by municipal corporations to which the legislature may delegate it. He owns his property subject to the restriction that it must be so used as not to injure others, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors, or the citizens generally. Such police regulations may disturb the enjoyment of individual rights, but they are not unconstitutional, though no provision is made for compensation for such disturbances.

8. MUNICIPAL CORPORATIONS — *Segregation Ordinance — Constitutional Law.*—A segregation ordinance such as is mentioned in paragraph 5 above is a reasonable exercise of the police power conferred by the State on the municipality, operates alike on all persons and property under the same circumstances and conditions, affects all persons similarly situated within the sphere of its operation, and is not in conflict with the fourteenth amendment of the constitution of the United States.

These two cases were heard together in the Court of Appeals. The case of *Hopkins and Another* v. *City of Richmond* was heard on a writ of error to the Hustings Court of the city of Richmond, and the case of *Coleman* v. *Town of Ashland* was heard on a writ of error to the Cir-

cuit Court of Hanover county. In each case the judgment of the trial court was affirmed.

*Affirmed.*

The following is a copy of the ordinance of the city of Richmond:

## AN ORDINANCE.

### (Approved April 19, 1911.)

To secure for white and colored people respectively the separate location of residences for each race.

Be it ordained by the council of the city of Richmond:

1. That it shall be unlawful for any white person to occupy as a residence or to establish and maintain as a place of public assembly, any house upon any street or alley between two adjacent streets on which a greater number of houses are occupied as residences by colored people than are occupied as residences by white people.

2. That it shall be unlawful for any colored person to occupy as a residence or to establish and maintain as a place of public assembly, any house upon any street or alley between two adjacent streets on which a greater number of houses are occupied as residences by white people than are occupied as residences by colored people.

3. That no person shall construct or locate on any block or square on which there is at that time no residence, any house or other building intended to be used as a residence, without declaring in his application for a permit to build, whether the house or building so to be constructed is designed to be occupied by white or colored people, and the building inspector of the city of Richmond shall not issue

any permit in such case unless the applicant complies with the provisions of this section.

4. That nothing in this ordinance shall affect the location of residences made previous to the approval of this ordinance, and nothing herein shall be so construed as to prevent the occupation of residences by white or colored servants or employees, on the square or block on which they are so employed.

5. Every person either by himself or through his agent violating, or any agent for another violating, any one or more of the provisions of this ordinance, shall be liable to a fine of not less than one hundred nor more than two hundred dollars recoverable before the police justice of this city of Richmond, and, in the discretion of the police justice such person may, in addition thereto, be confined in the city jail not less than thirty nor more than ninety days.

6. This ordinance shall be in force from its passage.

The following is a copy of the ordinance of the town of Ashland:

AN ORDINANCE,

(Approved September 12, 1911.)

To secure for white and colored people respectively the separate location of residence for each race.

Be it ordained by the council of the town of Ashland, Va.:

1. That it shall be unlawful for any white person to occupy as a residence or to establish and maintain as a school or place of public assembly, any house upon any street or alley between two adjacent streets on which a greater number of houses are occupied as residences by

colored people than are occupied as residences by white people.

2. That it shall be unlawful for any colored person to occupy as a residence or to establish and maintain as a school or place of public assembly, any house upon any street or alley between two adjacent streets on which a greater number of houses are occupied as residences by white people than are occupied as residences by colored people.

3. On all streets upon which no house is occupied the color of residence, schools and places of public assembly shall be governed by the adjacent streets, and any person desiring to build on such vacant street shall state whether the house or building so to be constructed is designed to be occupied by white or colored people, and the building committee of the town of Ashland shall not issue any permit in such case unless the applicant complies with the provisions of this section.

4. That nothing in this ordinance shall affect the location of residences made previous to the approval of this ordinance, and nothing herein shall be so construed as to prevent the occupation of residences by white or colored servants or employees, on the lot on which they are so employed.

5. Every person either by himself or through his agent violating, or any agent for another violating, any one or more of the provisions of this ordinance, shall be liable to a fine of not less than twenty nor more than fifty dollars, recoverable before the mayor of the town of Ashland, Va., and, in the discretion of the mayor such person may, in addition thereto, be confined in jail not less than thirty nor more than ninety days.

6. This ordinance shall be in force from its passage.

*Alfred E. Cohen* and *J. R. Pollard,* for Hopkins and another.

*J. R. Pollard, C. B. Jones, Jr.,* and *Bremner & Bazile,* for Coleman.

*H. R. Pollard,* for the city of Richmond.

*James E. Cannon* and *H. R. Pollard,* for the town of Ashland.

BY THE COURT:

These cases are before us on writs of error to judgments of the Hustings Court of the city of Richmond and the Circuit Court of the county of Hanover, respectively, maintaining the constitutionality of so-called segregation ordinances of the city of Richmond and the town of Ashland. These ordinances appear in the official report. The cases involve the same questions, were heard together, and we shall dispose of them accordingly.

We are of opinion that the ordinances are constitutional and valid in so far as they apply to persons whose rights, either as owners or as tenants, have accrued since the enactment of the ordinance. In case No. 1 the plaintiff in error, Mary S. Hopkins, is a negro and the plaintiff in error, Amedio Toni, is a white man. Neither of these parties, however, owns the property, but they were renters of the premises into which each moved as tenant subsequent to the enactment of the city ordinance and in violation thereof. In case No. 2, the plaintiff in error, John Coleman, is a negro, and subsequent to the enactment of the ordinance of the town became the owner of and moved into the property affected. The question, therefore, as to the effect of the ordinances upon persons whose *right of oc-*

88

*cupancy as owners* vested prior to the enactment of the ordinances does not specifically arise in these cases. It is contended, however, that the ordinances are not separable and that all their provisions must stand or fall together. We cannot accept this view, and are of opinion that they are divisible. It is true that sections one and two of each ordinance employ general terms which apply alike to persons owning property at the time the ordinances take effect and to persons acquiring property thereafter, but the effect is not different from what it would have been if these sections had each been subdivided so as to embrace in one paragraph persons owning property at the time the ordinance became effective, and in another paragraph persons subsequently acquiring property. If the ordinances were thus subdivided, and if it be conceded (as we feel constrained to hold) that they cannot be upheld as to property owners whose right of occupancy had vested at the time of their enactment, then we think it would be perfectly clear under the authorities that we could strike out and disregard the invalid subdivisions and uphold the validity of the remaining sections. *Black* v. *Trower,* 79 Va. 123, 127; *Trimble* v. *Commonwealth,* 96 Va. 819, 821, 32 S. E. 786; *Robertson* v. *Preston,* 97 Va. 296, 300-301, 33 S. E. 618; *Berea College* v. *Kentucky,* 211 U. S. 45, 54-5, 29 Sup. Ct. 33, 53 L. Ed. 81. Nor can we see that the power of the court thus to give effect to one feature of an ordinance when another feature thereof is void can be affected by the mere matter of articulation and phraseology.

In the instant cases, in which, as we have seen, no question as to pre-existing rights arises, we have no doubt as to the validity of the ordinances as applied to the plaintiffs in error, and no doubt, therefore, as to the correctness of the judgments complained of.

We are further of opinion that in so far, and only in so far, as the enactments in question limit or restrict the right of any white or colored person to move into and occupy property of which he was the owner at the time such enactments went into effect, they are beyond the police power of the municipalities and are invalid and inoperative. While it is true, as claimed by counsel for defendants in error, that the ordinances "do not move a single negro or a single white person from the home in which they may be living at the time of" their enactment, it is also true that their provisions are broad enough to prohibit both white and colored persons who own but do not occupy property at the time they take effect from thereafter, at their pleasure, moving into and personally occupying and enjoying the same. It is this latter result which we think the ordinances cannot lawfully bring about, and it is in this respect, and in this only, that we do not concur in the effect of the opinion of the circuit court hereinafter set out in full.

As already indicated, the particular retrospective effect of the enactments under consideration which we have condemned is not specifically involved in the judgments before us. We have dealt with this feature of the ordinances, however, because it is so closely related to the contention that they must be sustained or annulled as a whole, and because all the questions involved are of such general and public concern as that we deemed it proper to express fully our conclusions upon the whole subject.

In a written opinion in case No. 2, the judge of the Circuit Court of Hanover county has fully discussed the principles involved in these cases, except in so far as that opinion may be construed to hold that the provisions of these ordinances may deny to persons who have acquired title to real estate prior to the enactment of the ordinances

the right thereafter personally to enjoy and occupy the same.

In addition to the authorities referred to by the judge of the Circuit Court of Hanover county, we will add at the foot of his opinion a reference to certain other authorities which in our opinion tend to elucidate the important questions involved and to sustain the judgments under review.

The opinion is as follows:

"This case, which is a prosecution against John Coleman for the violation of an ordinance, passed by the town council of Ashland, on the 12th day of September, 1911, entitled an ordinance 'to secure for white and colored people, respectively, the separate location of residences for each race,' involves the validity of said ordinance, and was submitted to the court for decision, by agreement of parties, without the intervention of a jury, and, upon an agreed statement of facts as follows:

" 'It is agreed by counsel for both parties that the ordinance under which this prosecution is had was ordained on the 12th day of September, 1911, which ordinance is hereby made a part of this agreed statement of facts; that subsequent to said date, the defendant, John Coleman, purchased a certain residence property on Clay street, in the town of Ashland; that on said 12th day of September and ever since there were and are more houses on Clay street occupied as residences by white people than by colored. people; that said defendant is a colored man and that, subsequent to his purchase aforesaid he moved into said property and occupied the same as a residence and has continued so to do. It is also agreed, subject to exception as to admissibility, that at the time of the purchase aforesaid, the said property was in the possession of a colored tenant, who has continued to occupy said premises as a residence as a monthly tenant.'

"(Section 1) of the ordinance makes it unlawful for any white person to occupy as a residence any house upon any street, or alley, between two adjacent streets on which a greater number of houses are occupied as residences by colored people than are occupied as residences by white people.

"(Section 2) makes it unlawful for any colored person to occupy as a residence any house upon any street or alley between two adjacent streets on which a greater number of houses are occupied as residences by white people than by colored people.

"(Section 4) limits the application of the ordinance prospectively only.

"(Section 5) provides for the imposition of a fine for the violation of the ordinance, and, in the discretion of the mayor, a jail sentence, in addition, of not less than thirty nor more than ninety days.

"After the passage of the ordinance, the defendant, John Coleman, a colored man, acquired by purchase, and undertook to occupy as a residence, a certain house upon Clay street, which, at that time, had a greater number of houses occupied by white persons than by colored persons. A warrant was thereupon sworn out against the defendant, who was tried before the mayor of Ashland, convicted of having violated the ordinance, and fined. Coleman, thereupon, took an appeal, and is relying for his defense upon the alleged invalidity of the ordinance in question.

"As I view this case, it is necessary to consider and determine four questions:

"*First:* Did the town council of Ashland have authority to pass such an ordinance in exercise of the police power?

"*Second:* If so, did it, in violation of law, delegate such authority to residents upon, or lot owners on, any street or block?

"*Third:* Is the ordinance a reasonable exercise of the police power?

"*Fourth:* Is it in violation of the Fourteenth Amendment of the Constitution of the United States?

## I.

*The Authority of the Council to Pass Such an Ordinance in the Exercise of the Police Power.*

"A municipal corporation possesses, and can exercise the following powers and no others: 1st. Those granted in express words; 2d. Those necessarily implied, or necessarily incident to the power expressly granted; 3rd. Those absolutely essential to the declared object and purpose of the corporation, not simply convenient, but indispensable. *Treadway* v. *Schnauber*, 1 Dak. 227, 46 N. W. 464; *Vincent* v. *Nantucket*, 12 Cush. (Mass.) 103; *Clark* v. *Davenport*, 14 *Iowa*, 494; *Clark* v. *Des Moines*, 19 Iowa 199, 87 Am. Dec. 423; *Minturn* v. *Larue*, 64 U. S. (23 How.) 435, 16 L. Ed. 574; *Bank, etc.*, v. *Chillicothe*, 7 Ohio, p. 31, Pt. 2, 30 Am. Dec. 185; *Collins* v. *Hatch,* 18 Ohio 523, 51 Am. Dec. 465; *Sharp* v. *Spier*, 4 Hill (N. Y.), 76; *City of Richmond* v. *Lynch and Duke,* 106 Va. 324, 56 S. E. 139. It is furthermore true that any fair, reasonable doubt, concerning the existence of power, is resolved by the courts against the corporation, and the power is denied. (Same authorities.)

"It is conceded in the argument that the charter of the town of Ashland does not confer upon the town council authority to pass an ordinance providing for segregation of the races, nor does it confer any general police power. It is, however, true that the municipal corporations in Virginia can exercise not only those powers granted by their charters, but they can exercise those powers granted to them by general statutes, applying to all cities and towns

in the State, and it seems to follow that they can, under such a general statute, exercise: 1st. Those powers granted in express words; 2nd. Those necessarily implied, etc., and 3rd. Those absolutely essential to the declared object, etc., of the corporation, etc.

"Section 1038 of the Code of 1904 declares that the cities and towns of the Commonwealth, among other powers enumerated, shall have the right to 'preserve the peace and good order' within their limits, and it was under authority of this general statute that the ordinance in question was passed. The town council is not given authority in express words, either by its charter, or by the general statute above referred to (Sec. 1038), to pass an ordinance providing for the separation of the races so far as residence is concerned. (There is, however, a general statute, passed some six months after the passage of the ordinance, which confers the express authority upon all the cities and towns of the State, and provides for separate residential districts for white and colored people, upon certain conditions. Acts 1912, page 330. But the passage of this subsequent statute does not preclude the existence of the power hitherto, as is often evidenced by statutory enactment of the pre-existing common laws.) Therefore, at the time of the passage of the ordinance, the town council of Ashland had no authority, in express words, to pass such an ordinance. It did have, however, under section 1038 of the Code, express authority to preserve the peace and good order within its limits, and therefore, impliedly, to pass an ordinance necessarily incident to the power expressly granted. Therefore, (independently of any objections raised to the ordinance, which will be considered hereafter), if this ordinance tended to promote peace and good order within the town of Ashland, it was within the implied and incidental powers of the town of Ashland to pass the ordinance under the exercise of the police power conferred upon it by section

1038 of the Code of 1904. For the distinction as to the powers referred to see: *City of Lake View* v. *Tate,* 130 Ill. 247, 22 N. E. 791, 6 L. R. A. at p. 269; 1 Dillon Mun. Corp., secs. 319, 328, and authorities cited.

"Police power is defined in 8 Cyc. 863, as 'The name given to that inherent sovereignty which is the right and duty of the government, or its agents, to exercise whatever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advancing civilization of a higher complex character requires.'

"Chief Justice Shaw, in *Com.* v. *Alger,* 7 Cush. (Mass.) 85, declared: 'It is much easier to preserve and realize the existence and sources of this power than to mark its boundaries, or to prescribe limits to its exercise;' and in *Com.* v. *Bearse,* 132 Mass. 452, 42 Am. Rep. 450, it is said, 'No exposition has been given of this power more thorough and satisfactory or more often quoted with approval, than that of Chief Justice Shaw.'

"In *Champer* v. *Greencastle,* 138 Ind. 339, 35 N. E. 14, 24 L. R. A. 78, 26 Am. St. Rep. 390, it is stated 'that police power of the State, so far, has not received a full and complete definition. It may be said, however, to be the right of the State, or State functionary, to prescribe regulations for the good order, peace, health, protection, comfort, convenience and morals of the community, which do not encroach on a like power vested in Congress by the Federal Constitution, or which do not violate any of the provisions of the organic law.'

"It is defined in *Rochester* v. *West,* 29 N. Y. App. Div. 125, 51 N. Y. Supp. 482, as 'a power which inheres in the State, and in each political division thereof, to protect by such restraints and regulations as are reasonable and

proper, the lives, health, comfort and property of its citizens.'

"As before observed, the ordinance under consideration was passed on the 12th day of September, 1911, and the following March (1912), the legislature of Virginia solemnly declared that the residences of white and colored citizens in close proximity to one another in the cities and towns throughout the State endangered the preservation of public morals, public health, and public order, and they proceeded to empower the cities and towns of the State to pass ordinances providing for separation of the races within their limits. Acts 1912, page 330. It is manifest that, if this condition existed in March, 1912, it existed also in September, 1911, and that if the town of Ashland had authority under its charter, or general law, or impliedly, in September, 1911, to pass ordinances in the exercise of police power, to remedy this evil, it was the duty of the council to do so. The law-making power is the sole judge of when, if at all, it will enact public laws. *Toledo, &c. R. Co.* v. *Jacksonville,* 67 Ill. 37, 16 Am. Rep. 611; *Miller* v. *Fitchburg,* 180 Mass. 32, 61 N. E. 277, and the full measure of discretion is conceded to the legislative body of the municipality as of the State. *Knapp & Co.* v. *St. Louis,* 156 Mo. 343, 56 S. W. 1102.

"Consequently, when the legislature declared that a condition existed, in the early part of 1912, which endangered the 'public order,' it would seem to follow that the town of Ashland, in the latter part of 1911, was acting clearly within its powers, when it undertook to preserve good order within its confines by the passage of this ordinance.

"The fact that the town realized the grave danger liable to ensue, and which had resulted, as evidenced by the passage of various acts of the General Assembly, providing for separate coaches on trains, separate waiting rooms at sta-

89

tions, separate schools, etc., from too close association of the races, and took action in advance of that of the legislature along the same lines, is no argument against its power to pass the ordinance.

"I think, therefore, there can be no doubt as to the power of the council of the town of Ashland, under the general grant of power conferred by section 1038 of the Code of 1904, as well as under its incidental powers as a municipal corporation, to pass the ordinance in question, provided it is not objectionable on other grounds.

II.

*Did the Town Council of Ashland Delegate Their Authority to Residents and Lot Owners on the Various Streets and Blocks, Etc.*

"It is true that, so far as the functions of a municipal corporation are legislative, they rest in the discretion and judgment of the municipal body intrusted with them, and that body cannot refer the exercise of the power to the discretion and judgment of its subordinates, or any other authority. Cooley's Const. Lim. (7th ed.), 293; *McCrowell* v. *City of Bristol*, 89 Va. 652, 16 S. E. 867, 20 L. R. A. 653. There is, however, no delegation of authority by the town council of Ashland in the ordinance under consideration. In this case the operation of the ordinance does not depend upon the subsequent action, or consent, of any one, but immediately upon its passage it becomes effective prohibiting the establishment of residences, in the future, upon any given street, or block, by white, or colored, people not upon the consent, or by action of a majority of the residents of such block, or street, but by the fact as to whether a majority of residents of such block, or street, are white or colored.

What authority have such residents in the premises? Absolutely none.

"A number of cases were cited by the learned counsel for the defendant where the delegation of authority was plain. In the case of the *City of Chicago* v. *The Gunning System,* 144 Ill. App. Ct. 377, the city council passed an ordinance regarding the erection of billboards along pleasure drives and boulevards, as follows: 'No such sign or billboard shall be erected upon or along any boulevard or pleasure drive or in any street where three-quarters of the buildings in such street are devoted to residence purposes only, *unless the person or persons desiring to erect such sign or billboard shall first have secured the consent, in writing, of three-quarters of the residents and property owners on both sides of the street, etc.* The ordinance was declared invalid, among other reasons, because the operation of the ordinance was dependent entirely upon the subsequent action or will of the land owners and residents.

"But in *City of Chicago* v. *Stratton,* 162 Ill. 494, 44 N. E. 853, 35 L. R. A. 84, 53 Am. St. Rep. 325, an ordinance, which provided that 'It shall be unlawful for any person to locate, build, construct, or keep in any block in which two-thirds of the buildings are devoted exclusively to residence purposes, a livery, boarding, or sales stable, etc., within 200 feet of such residence on either side of the street, unless the owners of a majority of the lots in such block, etc., consent in writing, etc.' was declared valid by the same court which decided *City of Chicago* v. *The Gunning System, supra,* the court holding that in the case of *City of Chicago* v. *Stratton* the ordinance was not a delegation of legislative power to property owners, but that it provided for a contingency upon the happening of which the ordinance will be inoperative in certain localities. To the same effect, see also *Bull* v. *Read,* 13 Gratt. 78; *The Aurora* v. *U. S.,* 7 Cranch. 382, 3 L. Ed.

378.   It needs no argument to demonstrate that if there was no delegation of authority in these cases there is none in the case at bar, and it is so held.

### III.

### *Is the Ordinance a Reasonable Exercise of the Police Power?*

"Where the legislature, in terms, confers upon a municipal corporation the power to pass ordinances of a specific and defined character, if the power thus delegated be not in conflict with the Constitution, an ordinance passed pursuant thereto cannot be impeached because it would have been regarded as unreasonable if it had been passed under the incidental power of the corporation, or under a grant of power general in its nature.   In other words, what the legislature distinctly says may be done cannot be set aside by the courts because they may deem it unreasonable, or against sound policy.   But where the power to legislate in a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid.   1 Dillon Mun. Corp., secs. 319, 328, and authorities cited.

"It has been shown above that if the town council of Ashland had authority to pass the segregation ordinance under consideration in September, 1911, it derived such authority from section 1038 of the Code, which is a grant of power general in its nature, or it is an incidental power of the municipality.   Therefore, the ordinance must be a reasonable exercise of the power conferred.

"Whether a particular ordinance is unreasonable, and therefore void, is a question for the court. but in determining it the court will have regard to all the circumstances

of the city and the objects sought to be attained, and the necessity which exists for the ordinance. 1 Dillon Mun. Corp., sec. 327; *Toledo, &c. R. Co.* v. *Jacksonville,* 67 Ill. 37, 16 Am. Rep. 611; *Miller* v. *Fitchburg,* 180 Mass. 32, 61 N. E. 277.

"The central idea of the ordinance under consideration seems very manifest. It is to prevent too close association of the races, which association results, or tends to result, in breaches of peace, immorality and danger to the health. The history of legislation on this subject heretofore adverted to, as well as the *phraseology* of the ordinance itself, confirm this view. The attainment of the objects in view is one much to be desired, and if the ordinance is not necessarily oppressive or unreasonable, it is the duty of the court to hold it valid, provided it does not conflict with the limitations placed upon legislative bodies by the Constitution of Virginia, or that of the United States (which proposition will be considered later). An analysis of the ordinance, in the light of the facts agreed upon, should determine this question. The ordinance is prospective in its application. It does not affect rental contracts existing at the time of its passage. It does not divest any person of his property, or rights therein, at the time of the passage of the ordinance. Any white person owning property and occupying it in a street, or block, at the passage of the ordinance, known after the passage of the ordinance as a colored block, is not affected by the ordinance either as to his ownership, or occupancy, but he may, if he wills, continue to own and occupy his property as before its passage. The same thing applies to colored persons, under like circumstances Under the ordinance, either colored or white persons may, after the passage of the ordinance, purchase and hold property wherever they may desire within the corporate limits. The only right affected by the ordinance is the right to occupy houses

in certain streets, or blocks, as residences, and this regulation of the use of property applies without discrimination to all white and colored persons alike within the town of Ashland.

"It would seem that, if a municipal corporation has authority to provide for separation of the races within its limits, no more reasonable, or less oppressive, ordinance could be devised than the one under consideration.

"In *Polglaise* v. *Commonwealth,* 114 Va. 850, at p. 860, 76 S. E. at p. 900, a case in which the question of the reasonableness of a resolution of the board of supervisors of the county of Spotsylvania, looking to the protection of the improved roads of the county, passed under the police power of the county, was raised, Cardwell, J., said: 'The General Assembly is a co-ordinate branch of the State government, and so is the law-making power of municipal corporations within their prescribed limits. It is no more competent for the judiciary to interfere with the legislative acts of the one than the other. Where, therefore, municipal corporations or their officers are acting within well-recognized powers, or exercising discretionary power, the courts are wholly unwarranted in interfering, unless fraud is shown, or the power or discretion is being manifestly abused, to the oppression of the citizen. *Wagner* v. *Bristol Belt L. Co.,* 108 Va. 594, 62 S. E. 391, 25 L. R. A. (N. S.) 1278.

" 'It has been repeatedly decided by this court, and well recognized by text-writers and in the decided cases in other jurisdictions, as settled law, that courts can interfere only to prevent a fraudulent and manifestly abusive or oppressive exercise of the powers conferred upon the council of a city by its charter or the general law, since the discretion of municipal corporations, within the sphere of their powers, is as wide as that possessed by the government of a State. *Wagner* v. *Bristol B. L. Co., supra; Elsner Bros.* v.

*Hawkins, Com'r,* 113 Va. 47, 73 S. E. 479,' Ann. Cas. 1913, D, 1278.

"In the case at bar there is no evidence of any sort whatever appearing in the record to show that the ordinance complained of was unreasonable or unnecessary. On the contrary, the court would take judicial notice of the fact that 'the preservation of public morals, public health and public order in the cities and towns of this State is endangered by the residence of white and colored people in close proximity to one another.' Acts 1912, p. 330.

"Upon the facts in this case, John Coleman, a colored man, in spite of the fact that he knew, or ought to have known, the law, after its passage, purchased the residence, and, in violation of the ordinance, occupied it. If the ordinance is valid in other respects, he is hardly in a position now to take advantage of his own wrong, upon a plea that he is being unreasonably deprived of the use of his property.

"There is no question about the authority of a municipality invested by its charter or by general statute with power to preserve the peace and health, to restrict the use of private property in the interest of the public, provided the restriction is reasonable. 1 Dillon Mun. Corp., sec. 144 and note; *Slaughterhouse Cases,* 16 Wall. 62, 21 L. Ed. 404; *Taunton* v. *Taylor,* 116 Mass. 254; *Watertown* v. *Mayo,* 109 Mass. 315, 12 Am. Rep. 694; *Brown* v. *Keener,* 74 N. C. 714; *Pool* v. *Trexler,* 76 N. C. 297; *Com.* v. *Alger,* 7 Cush. (Mass.) 84; *Town Council of Summerville* v. *Pressley,* 33 S. C. 56, 11 S. E. 545, 8 L. R. A. 854, 26 Am. St. Rep. 659. In the last named case an ordinance passed by the town council, in the exercise of police power, prohibited the cultivation for agricultural purposes of more than one-eighth of an acre by any family or household within the corporation limits except for flowers, etc., was held valid and declared to be a reasonable exercise of the police power. Every

citizen holds his land subservient to such police regulation as the legislature in its wisdom may enact for the general welfare. *Brown* v. *Keener, supra; Pool* v. *Trexler,* 76 N. C. 297.

" 'Every citizen holds his property subject to the proper exercise of this (police) power either by the State legislature directly, or by municipal corporations to which the legislature may delegate it. Laws and ordinances relating to the comfort, health, convenience, good order and general welfare of the inhabitants are comprehensively styled "Police Laws or Regulations"; and it is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner; if he suffers injury, it is either *damnum absque injuria,* or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. The citizen owns his property absolutely, it is true; it cannot be taken from him for any private use whatever without his consent, nor for any public use without compensation. Still he owns it subject to this restriction, namely, that it must be so used as not to injure others, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors, or the citizens generally. Those regulations rest upon the maxim, *salus populi suprema est lex.* This power to restrain a private injurious use of property is very different from the right of eminent domain. It is not a taking of private property for public use,' etc. 1 Dillon Mun. Corp. (3rd ed.), sec. 141.

"In the great leading case upon the subject of *Com.* v. *Alger,* 7 Cush. (Mass.) 85, Chief Justice Shaw said: 'Rights

of property like all other social and conventional rights are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and elections established by law as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient. This is very different from the right of eminent domain, the right of a government to take and appropriate private property to public use whenever the public exigency requires it—which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the public power—the power vested in the legislature by the Constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties, or without, not repugnant to the Constitution as it shall judge to be for the good and welfare of the Commonwealth, and of the subjects of the same.'

"As has been heretofore said, police power extends to the protection of the lives, limbs, health, comfort, morals and quiet of all persons, and it has been seen that in promoting these benefits of the public, any reasonable restriction may be placed upon the use of private property, and that such restrictions do not constitute condemnation of private property for public use. It is the declared policy of this State that close association of the races tends to breach of the peace, unsanitary conditions, discomfort, immorality and disquiet. Hence the legislature has seen fit to confer express authority upon the cities and towns of the Commonwealth to enact segregation ordinances. It has provided for separate coaches on the railroads of the State, and separation on the street cars, separate waiting rooms at railroad stations, and separate schools, all because these things promote peace, good order, health and morality.

"In view of all this there appears to be nothing unreasonable in placing the restriction above set out on the use of property to the same end.

## IV.

### The Fourteenth Amendment.

"We have only to deal with the first section of this amendment, which is as follows: 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'

"It will thus be seen that the amendment itself draws a sharp distinction between a citizen of the United States and a citizen of a State, and classifies the privileges of citizens into those which they have as 'citizens of the United States' and those which they have as 'citizens of the State wherein they reside.' *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 4 L. Ed. 629; *Gibbons* v. *Ogden,* 9 Wheat. 203, 6 L. Ed. 23; *New York* v. *Miln,* 11 Pet. 133, 9 L. Ed. 648; *Scott* v. *Sandford,* 19 How. 404, 15 L. Ed. 691; *License Tax Cases,* 5 Wall. 471, 18 L. E. D. 497; *Paul* v. *Virginia,* 8 Wall. 180, 19 L. Ed. 357; *The Slaughterhouse Cases,* 16 Wall. 36, 21 L. Ed. 394; *U. S.* v. *Reese,* 92 U. S. 214, 23 L. Ed. 563; *U. S.* v. *Cruikshank,* 92 U. S. 542, 23 L. Ed. 588.

"The Constitution forbids the abridging of the privileges of a citizen of the United States, but does not forbid the State from abridging the privileges of its own citizens.

"The rights which a person has as a citizen of the United States are those which the Constitution and laws of the

United States confer upon a citizen as a citizen of the United States. For instance, a man is a citizen of a State by virtue of his being resident there; but if he moves into another State, he becomes at once a citizen there by operation of the Constitution making him a citizen there, and needs no special naturalization which, but for the Constitution, he would need.

"On the other hand, the rights and privileges, which a citizen of a State has are those which pertain to him as a member of society and which would be his if his State were not a member of the Union. Over these the States have the usual power belonging to government, subject to the proviso that they shall not deny to any person within the jurisdiction (*i. e.*, to their own citizens, the citizens of other States, or aliens) the equal protection of the laws. These powers extend to all objects, which, in the ordinary course of affairs, concern the lives, liberties (privileges), and properties of people, and of the internal order, improvement and prosperity of the State. Federalist, No. 45. As was said by Chief Justice Marshall in the *Dartmouth College Case:* 'The framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, and the instrument they have given us is not to be so construed.' If, in the *Slaughterhouse Cases*, the privilege of butchering animals was of the class belonging to persons as citizens of the State of Louisiana and not belonging to them as citizens of the United States, it is difficult to see why the right here to reside where one chooses is not a right to be exercised by a citizen of the State of Virginia and not as a citizen of the United States.

"Passing now to the second part of the declarative clause of the amendment, it is equally clear that the defendant has not been deprived of his life, liberty, or property, without

due process of law, nor do I understand he is making any such contention.

"The third part of this clause prohibits the State from denying to any person within its jurisdiction the equal protection of the laws, and it is on this point that most, if not all, of the cases have turned, which involve so-called discriminatory legislation as respects the races.

※ "The theory on which such legislation is based cannot be better illustrated than by the liberal quotation from the case of *West Chester & P. Co.* v. *Miles*, reported in 55 Pa. 209, 93 Am. Dec. 744, involving the legality of a separate law on public conveyances. 'To assert separateness is not to declare inferiority in either race. It is not to declare one a slave and the other a freeman. That would be to draw the illogical sequence of infericrity from difference only. It is simply to say that, following the order of Divine Providence, human authority ought not to compel these widely separated races to intermix. The right of each to be free from social contact is as clear as to be free from intermarriage. The former may be less repulsive as a condition, but not less entitled to protection as a right. When, therefore, we declare a right to maintain separate relations as far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice or caste, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts.'

"In *Munn* v. *Illinois*, 94 N. S. 113, 24 L. Ed. 77, C. J. Waite, in commenting upon the definition of police powers by C. J. Taney in the *License Cases*, to the effect that they are nothing more or less than the powers of government inherent in every sovereignty—that is to say, the power to govern men and things—said: 'Under these powers the gov-

ernment regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulations become necessary for the public good.'

"In the well-considered case of *Barbier* v. *Connolly,* 113 U. S. 27, on p. 31, 5 Sup. Ct. 357, on p. 359, 28 L. Ed. 923, there was involved the validity of a municipal ordinance prohibiting from washing and ironing in public laundries and wash-houses within defined limits, from ten at night to six in the morning. Justice Field said: 'The Fourteenth Amendment, in declaring that no State shall deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws, undoubtedly intended, not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights: that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have all access to the courts of the country for the protection of their persons and property, and prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of anyone except as applied to the same pursuits by others under like circumstances; that no greater burdens should be placed upon one than are laid upon others in the same calling and condition, and that in the administration of criminal justice no different or higher punishment should be imposed upon one than such as is prescribed to all for like offences. But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, educa-

tion and good order of the people and to legislate so as to increase the industries of the State, develop its resources and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains. Special burdens are often necessary for general benefits—for supplying water, preventing flies, lighting districts, cleaning streets, opening parks, and many other objects. Regulations for these purposes may press with more or less weight upon one another, but they are designed, not to impose unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.

" 'In the execution of admitted powers necessary proceedings are often required which are cumbersome, dilatory and expensive, yet, if no discrimination against any one be made and no substantial right be impaired by them they are not obnoxious to any constitutional objection. The inconvenience arising in the administration of the laws from this cause are matters entirely for the consideration of the State; they can be remedied by the State. In the case before us, the provision requiring certificates from the health officer and the board of fire wardens may, in some instances, be unnecessary, and the changes to be made to meet the conditions prescribed may be burdensome, but, as we have said, this is a matter for the determination of the

municipality in the execution of its police powers, and not a violation of any substantial right of the individual.'

"In *Mugler* v. *Kansas,* 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, which was the prosecution of a brewer for violation of a statute prohibiting the manufacture or sale of liquor and passed subsequent to the erection and operation of the brewery, the court quoted liberally from *Barbier* v. *Connolly,* and then proceeded on p. 664 of 123 U. S., on p. 298 of 8 Sup. Ct. 31 L. Ed. 205, to say, in reply to the contention that such legislation could not be enforced against those who, at the time, happen to own property the chief value of which consists in its fitness for such manufacturing purposes unless compensation is first made for the diminution in value of their property: 'This interpretation of the Fourteenth Amendment is inadmissible. It cannot be supposed that the State intended, by adopting that amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community.'

"In that case, it will be noted, that alleged discriminatory legislation was enacted after the acquisition by the defendant of this property, which was especially adapted to the use to which it was then being put, while in the case in hand the defendant deliberately acquired his property and undertook to use it in an unlawful manner after the passage of the ordinance.

"In *Camfield* v. *United States,* 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260, the court cited with approval the case of *Rideout* v. *Knox,* 148 Mass. 368, 19 N. E. 390, 2 L. R. A. 81 12 Am. St. Rep. 560, which had under review a Massachusetts statute, declaring that any fence 'unnecessarily exceeding six feet in height, maliciously erected or maintained for the purpose of annoying the owners or occupants of adjoining property,' should be deemed a private nuis-

ance for which any person injured might have an action of tort. The Massachusetts court held the statute constitutional with reference to fences already erected, basing its decision on the fact, that 'Police regulation may regulate the use of property in ways which greatly diminish its value.' The United States court, by way of comment, said on p. 524 of 167 U. S., on p. 866 of 17 Sup. Ct. 42 L. Ed. 260: 'The case is authority for the proposition that the police power is not subject to any definite limitations, but is co-extensive with the necessities of the case and the safeguard of the public interests. Apparently the principal doubt entertained by the court was whether the maintenance of a private fence could be said to be "injurious to the public at large," but it seems to have been of opinion that such a nuisance might give rise to disputes and bickerings prejudicial to the peace and good order of the community.'

"Mr. Justice Holmes goes still further in the case of *Noble State Bank* v. *Haskell*, 219 U. S. 104, on p. 111, 31 Sup. Ct. 186, on p. 188, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, and after citing *Camfield* v. *U. S.* with approval, declares: 'It may be said in a general way that the police power extends to all the great public needs. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality and strong preponderant opinion to be greatly and immediately necessary to the public welfare.'

In *C. B. & Q. R. Co.* v. *McGuire*, 219 U. S. 459, 31 Sup. Ct. 259, 55 L. Ed. 328, involving the validity of an Iowa statute imposing a liability on railway corporations for damages occasioned by negligence and providing that no contract which restricts such liability shall be legal or binding, the Supreme Court of Iowa held the statute constitutional, which decision was affirmed on appeal to the United States court. In discussing the right to make

contracts, Justice Hughes said, on p. 568: 'It is subject also, in the field of State action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals and welfare of those subject to its jurisdiction.' Then, after citing numerous and various cases in which such right was denied, the distinguished jurist proceeded: 'The principle involved in these decisions is that where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for government to effect, the legislature transcends the limits of its power in interfering with liberty of contract; but where there is reasonable relation to an object within the governmental authority, the exercise of the legislative discretion is not subject to judicial review. The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.'

"It is apparent from these citations that the exercise by a State of its police power is not prohibited by anything contained in the Fourteenth Amendment so long as such exercise is reasonable and not merely arbitrary. As was well said in *Barbier* v. *Connolly*, as well as in the later decisions: 'Though in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is

prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.'

"If the ordinance in question meets this test, it is valid, if not it is invalid. Let us then proceed to examine the ordinance and apply the test.

"It will be noted that the ordinance is expressly declared to be prospective only in its application. It deals with conditions as they should thereafter arise, and does not seek to disturb the existing occupancy of any property. If at the time of its passage, there were white and colored persons residing on the same street, they are permitted to continue such residence. By its first section it prohibits any white person from thereafter residing upon a street on which a majority of houses were then occupied by colored persons. Could anything be fairer, or more impartial, in its operation than this? It could make no difference whether an offender against the ordinance were white or colored. In either event the same penalty is prescribed for its violation. It can be truly said to operate alike on all persons and property under the same circumstances and conditions and to affect all persons similarly situated, within the sphere of its operation.

"No case of this precise character has been adjudicated, and yet there are many analogous cases in which the validity of legislation looking to the separation of the races has been vindicated upon this very ground of public policy.

"Thus in *Ex parte Kinney*, 3 Va. Law Journal, 370, Fed. Cas. No. 7825, Judge Hughes denied a writ of *habeas corpus* to a man who had been convicted and sentenced for violating the Virginia statute against mixed marriage, upon the ground that such statute, operating as it did alike upon both races, neither abridged the privileges of a citizen of

the United States nor denied to any person within its jurisdiction the equal protection of the laws.

"In 1890 the State of Louisiana passed a statute providing for separate railway carriages for the white and colored races, which was under review in *Plessy* v. *Ferguson,* 163 U. S. 537, 16 Sup. Ct. 1138, 41 L. Ed. 256. The court held that the enforced separation of the races as applied to the internal commerce of the State, neither abridged the privileges or immunities of the colored man, deprived him of his property without due process of law, nor denies him the equal protection of the laws, within the meaning of the Fourteenth Amendment, and continued on p. 550 of 163 U. S., on p. 1143 of 16 Sup. Ct. (41 L. Ed. 256) : 'So far, then, as a conflict with the Fourteenth Amendment is concerned, the case reduces itself to the question whether the statute of Louisana is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the legislature. In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. Gauged by this standard, we cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable, is more obnoxious to the Fourteenth Amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia, the constitutionality of which does not seem to have been questioned or the corresponding acts of State legislatures. We consider the fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything

found in the act but solely because the colored race chooses to put that construction upon it.'

"This case was affirmed in *C. & O. Co.* v. *Kentucky,* 179 U. S. 388, 21 Sup. Ct. 101, 45 L. Ed. 244, and the same doctrine has been announced in numerous State courts, subject only to the qualification that the quality of the accommodations must be equal.

"Subsequent to the decision of the *Plessy Case,* the question came before the United States Supreme Court of the validity of the separate school law in the case of *Cumming* v. *County Board of Education,* 175 U. S. 528, 20 Sup. Ct. 197, 44 L. Ed. 262, where Justice Harlan said: 'We may add that while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by State taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.'

In conclusion, I would quote the language of the court in *State* v. *Roby,* 142 Ind.. 169, 41 N. E. 145, 33 L. R. A. 213, 51 Am. St. Rep. 174: 'There is the very best of reasons why doubts should be resolved in favor of the validity of the act of the legislature. In case of doubt there might be a mistake in declaring the act unconstitutional by the court. To declare an act void for unconstitutionality, through a mistake of a court of last resort, would have the effect, not only of paralyzing one of the co-ordinate departments of the State government, but it would be an usurpation of power by the court—a power withheld from it by the people in the Constitution. The dangerous consequences liable to result from a possible mistake declaring

an act of the legislature void for unconstitutionality are sufficient, alone, to inspire the judiciary with the greatest caution in that respect, and furnish ample justification for the ruling that no statute will be declared unconstitutional unless its conflict with the Constitution is beyond reasonable doubt.'

"An ordinance, properly enacted, has all the force of a law within the limits of the municipality. *New Orleans Co.* v. *Louisiana, &c. Co.*, 125 U. S. 18, 8 Sup. Ct. 741, 31 L. Ed. 607; *Walla Walla City* v. *Walla Walla Water Co.*, 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341; *St. Paul Gas Co.* v. *St. Paul*, 181 U. S. 142, 21 Sup. Ct. 575, 55 L. Ed. 788.

"In conclusion, it is only necessary to say that, in my opinion, the town council of Ashland had full authority, under section 1038 of the Code of 1904, to pass an ordinance providing for separate residences for white and colored people within its limits; that the ordinance passed was a reasonable exercise of this power; and that it does not conflict with the Fourteenth Amendment of the Constitution of the United States.

"The ordinance is, therefore, declared valid, and the conviction of the defendant by the mayor of Ashland is sustained."

Additional authorities for the following propositions:

1. That the councils of the city and town had power to enact the segregation ordinances: 2 McQuillin Mun. Corp., sec. 724, p. 1570; 2 Dillon Mun. Corp., sec. 600; 3 McQuillin Mun. Corp., sec. 895, p. 1899; *L. & N. R. R. Co.* v. *Kentucky*, 161 U. S. 667, 16 Sup. Ct. 714, 40 L. Ed. 849; *Elsner Bros.* v. *Hawkins*, 113 Va. 47, 73 S. E. 479, Ann. Cas. 1913 D, 1278.

And as to the city of Richmond, see, also, city charter, secs. 19, 19x, 20.

2. As to the reasonableness of the terms of the ordinances: McQuillin Mun. Ordinances, secs. 186, 432; Mc-

Quillin Mun. Corp., sec. 732; *Childs* v. *C. & O. R. Co.*, 218 U. S. 71, 77, 30 Sup. Ct. 667, 54 L. Ed. 936, 20 Ann Cas. 980; *Schmidinger* v. *Chicago*, 226 U. S. 578, 33 Sup. Ct. 182, 57 L. Ed. 364, Ann. Cas. 1914 B, 284; *Adams* v. *Milwaukee*, 228 U. S. 572, 581, 33 Sup. Ct. 610, 57 L. Ed. 971.

3. As to constitutionality and validity: *Louisville* v. *Miss.*, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784; *Hall* v. *DeCuir*, 95 U. S. 485, 24 L. Ed. 547; *Berea College* v. *Kentucky*, 211 U. S. 45, 29 Sup. Ct. 33, 53 L. Ed. 81; *McCabe* v. *Atchison T. & S. Ry. Co.*, 235 U. S. 151, 35 Sup. Ct. 69, 59 L. Ed. —.

Segregation ordinances, more or less similar to those involved in the instant cases, have been passed upon by the courts of last resort in Maryland, North Carolina, Georgia and Kentucky in the following cases, not cited in the foregoing opinion or list of authorities, to-wit: *State* v. *Curry*, 121 Md. 534, 88 Atl. 545, 47 L. R. A. (N. S.) 1087, Ann. Cas. 1914 B, 957; *State* v. *Darnell*, 166 N. C. 300, 81 S. E. 338; *Carey* v. *City of Atlanta* (Ga.), 84 S. E. 456; and *Harris* v. *City of Louisville* (Ky.), 177 S. W. 472. In each of the first three of these cases the particular ordinance involved was declared invalid, and in the last one its validity was upheld. The Maryland and Georgia cases, as we conceive, support the conclusion here reached. All four of these cases are reviewed, as are a number of other pertinent authorities, in a recent comprehensive article on "Segregation Ordinances," by the associate editor of the Virginia Law Register, 1 Va. Law Reg. (N. S), pp. 330-356.

In conclusion, the writer of the above article, in part, aptly observes: "Segregation ordinances which are intended to operate as *bona fide* police regulations, are reasonably necessary for that purpose, operate reasonably, and

do not unduly interfere with private rights, are constitutional.

"The *bona fides* of these ordinances cannot be made a serious question in law or economy. The different cities have striven to do a public good, and have not been actuated merely by race prejudice. The truth is these ordinances are a natural outgrowth of existing conditions and are in the most instances intended to preserve such conditions by preserving present separate residences and preventing one race from encroaching upon the other. The ordinances are intended to protect each race from harm from the other."

KEITH, P., dissents.

*Judgments affirmed.*